STEPHEN S. HASEGAWA (admitted *pro hac vice*)
  shasegawa@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001

ANDREW C. SHEN
  ashen@kellogghansen.com
JAMES M. WEBSTER (*pro hac* application
forthcoming)
  jwebster@kellogghansen.com
DAVID L. SCHWARZ (*pro hac* application
forthcoming)
  dschwarz@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999

RISHI BHANDARI
  rb@mandelbhandari.com
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, NY 10005
Tel:  (212) 269-5600
Fax: (646) 964-6667

ARI YAMPOLSKY (pro hac application
forthcoming)
  ayampolsky@constantinecannon.com
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, CA 94111
Tel. (415) 639-4001

Attorneys for *Qui Tam* Plaintiff and Relator
Adam Hart

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MASSACHUSETTS, | No. 15 Civ. 0903 (RA)  **FIRST AMENDED COMPLAINT** |

MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WASHINGTON, and the DISTRICT OF COLUMBIA, *ex rel.* ADAM HART,

                     Plaintiffs,

        - against -

MCKESSON CORPORATION, MCKESSON SPECIALTY DISTRIBUTION LLC, and MCKESSON SPECIALTY CARE DISTRIBUTION CORPORATION, collectively d/b/a MCKESSON SPECIALTY HEALTH,

                     Defendants.

**JURY TRIAL DEMANDED**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................... 1

II.     PARTIES............................................................................................ 6

III.    JURISDICTION AND VENUE.......................................................... 8

IV.     FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS ...... 9

      A.      Medicare ................................................................................. 9

      B.      Medicaid ................................................................................. 9

      C.      Other Federal and State-Funded Health Care Programs .............. 10

V.      APPLICABLE LAW .......................................................................... 11

      A.      The Anti-Kickback Statute Prohibits Offering Financial Incentives to Induce Physicians to Prescribe Drugs Paid for with Federal Funds ...................................................................................... 11

      B.      Physician Practices Must Comply With the Anti-Kickback Statute to Participate in and Receive Payment from Federal and State-Funded Health Care Programs .................................................... 12

VI.     FACTUAL BACKGROUND .............................................................. 14

VII.    MCKESSON'S USE OF BUSINESS-MANAGEMENT TOOLS TO INDUCE PHARMACEUTICAL DRUG PURCHASES IN VIOLATION OF THE ANTI-KICKBACK STATUTE ................................................ 16

      A.      The Margin Analyzer ................................................................ 17

            1.      The Margin Analyzer Is a Valuable Business-Management Tool...................................................................................... 17

            2.      McKesson Uses The Margin Analyzer To Win or To Maintain Business......................................................... 22

            3.      McKesson's Quarterly Use of the Margin Analyzer to Increase Physician Practices' Drug Profit......................... 24

            4.      McKesson's Use of the Margin Analyzer to Encourage Customers to Prescribe New Drugs and Drugs with New Pricing Terms ................................................................ 30

      B.      The Regimen Profiler ............................................................... 32

      C.      McKesson Acknowledges Its Business-Management Tools Have Significant Value..................................................................... 35

      D.      McKesson Knows That These Kickbacks Result in the Submission of False Claims to Federal and State Health-Insurance Programs 40

      E.      McKesson Uses Valuable Inducements to Knowingly Cause the Submission of False Claims to Federal and State Health-Insurance Programs ................................................................................... 41

VIII.   CAUSES OF ACTION ....................................................................... 45

IX.     PRAYER ........................................................................................... 73

X.      DEMAND FOR JURY TRIAL ............................................................ 74

*Qui Tam* Plaintiff and Relator Adam Hart ("Relator"), through his attorneys Phillips & Cohen LLP, Kellogg Hansen Todd Figel & Frederick PLLC, and Mandel Bhandari LLP, on behalf of the United States of America, and the States of California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and the District of Columbia (collectively "the States"),[1] for his First Amended Complaint against Defendants McKesson Corporation, McKesson Specialty Distribution LLC, McKesson Specialty Care Distribution Corporation (collectively "Defendants" or "McKesson"), alleges, based upon personal knowledge, relevant documents, and information and belief, as follows:

## I.    INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and the States arising from false and/or fraudulent statements, records, and claims caused to be made by Defendants and/or their agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("the Act" or "FCA"), the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and analogous laws of the States.

2.      McKesson Corporation, headquartered in Irving, Texas provides pharmaceuticals, medical supplies, and information technology to health care providers across the United States.  Through its McKesson Specialty Health ("MSH") business unit, McKesson is a wholesale distributor of drugs to physician health care practices engaged in a range of specialties, including oncology.

3.      As an inducement to purchase pharmaceutical drugs from McKesson instead of from its competitors, McKesson provides physician practices, free of charge, a

---

[1] The claims asserted on behalf of the State of Maryland have been dismissed without prejudice.

number of valuable business-management tools designed to quantify the financial benefit to each practice from prescribing the highest-margin drug or regimen over lower-margin equivalents. McKesson recognizes the significant independent value of these tools, and encourages its sales staff to tout their ability to maximize the profits for physician practices purchasing specialty drugs from McKesson. McKesson seeks to obtain and maintain wholesale distribution customers by providing kickbacks in the form of free access to these "value added services." Although McKesson touts the value of these tools and their ability to aid its customers' bottom line, it refuses to sell them. Rather, it will only make them available (for free) to physician groups in exchange for an agreement to purchase a substantial percentage of their pharmaceuticals from McKesson. They are an inducement to purchase drugs from McKesson. Because McKesson's customers seek and obtain reimbursements from federally funded health care programs for the kickback-tainted drugs that they purchase from McKesson, McKesson's conduct violates the AKS, the FCA, and State analogues thereof.

4.      This Complaint primarily focuses on two particular "value added tools" that McKesson provides free of charge to induce customer drug purchases, the Margin Analyzer and the Regimen Profiler. For each recipient, the Margin Analyzer identifies all pharmaceutical drugs a practice purchases and all available "therapeutically interchangeable" alternatives to those drugs. It includes a "Therapeutic Interchange Calculator" or "TIC" that calculates the "spread" or "margin" for each such drug on a per-dosage basis—the difference between the amount the physician practice can be reimbursed for the drug by a government health care program or private insurer and the price at which that particular physician practice may acquire the drug from McKesson. The TIC then estimates (from prior usage) the potential increase in profit a practice could realize if it prescribed only the highest-margin drugs McKesson sells. McKesson also estimates the increased revenue that it could earn if the relevant practice group were to move to prescribing only the highest-margin drugs, although the Margin Analyzer

FIRST AMENDED COMPLAINT

template states in bold and ALL CAPS "**DELETE THESE COLUMNS PRIOR TO SAVING AND PRIOR TO SHOWING CUSTOMERS**."

5. The Regimen Profiler is similar to the Margin Analyzer, but rather than analyzing product margin on a drug-by-drug basis, it analyzes the revenue that can be generated by a physician practice group over the entire course of treatment regimens. The Regimen Profiler compares a practice's reimbursement for a treatment regimen to the practice's cost of providing that regimen (including the cost associated with purchasing (from McKesson) and selling each interchangeable drug), and calculates the potential increase in profit a practice could realize by using only the most profitable alternative regimen.

6. The Margin Analyzer and the Regimen Profiler business-management tools are premised upon the "therapeutic interchangeability" of the drugs and regimens they evaluate. They do not purport to identify any clinical or therapeutic benefit to the patient from the drug-prescription decisions they encourage. Instead, these tools urge doctors to consider "therapeutically interchangeable" options and to prescribe the highest-margin drug that will best serve the physician practices' (and McKesson's) financial interests. Internal and external marketing materials associated with these products make clear that their goal is to help improve a physician practice group's "overall financial success," without regard for what is in the best interest (clinically or financially) of the patient. Since the highest-margin drug is often the most expensive drug, the Margin Analyzer and the Regimen Profiler products result in increased cost to payors—including federal and State government health care programs, private insurers, and patients responsible for co-pays—and subvert cost competition among wholesalers, all without any benefit to patients.

7. At all relevant times, McKesson has known that providing valuable services or tools to induce physician practices to purchase McKesson's drugs violates the AKS, which is intended to ensure that physicians make clinical decisions based on

informed, impartial medical judgment, not their personal financial motives.  Indeed, the prohibition against providing anything of value to influence the decisions of health care professionals is written into McKesson's own Employee Code of Conduct.  By influencing physicians' prescribing practices with valuable kickbacks, McKesson knowingly and routinely violated this fundamental principle, corrupting physicians' medical judgment and increasing costs to federal health care programs and beneficiaries.

8.     All claims that physicians submitted for products or services tainted by McKesson's illegal kickbacks are ineligible for reimbursement by Medicare, Medicaid, and other federal and State-funded health care programs.  These physician practice groups submitted hundreds of millions of dollars' worth of claims for reimbursement to federal health care programs after receiving kickbacks from McKesson in the form of the Margin Analyzer and the Regimen Profiler "value added services," and additional claims to State health care programs.  McKesson has caused its physician customers to submit kickback-tainted claims.  Consequently, McKesson has damaged the United States and the States in a significant amount.

9.     McKesson's conduct alleged in this Complaint violates the federal False Claims Act and False Claims Acts of the States.  The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986 to enhance the ability of the United States government to recover losses sustained due to fraud against it. Congress amended the Act after it found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization.  Congress intended the amendments to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

10.    The FCA prohibits:  (a) knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval;

FIRST AMENDED COMPLAINT

(b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; or (c) conspiring to violate any of these provisions.  31 U.S.C. § 3729(a)(1)(A)–(C).  Any person who violates the FCA is liable for a civil penalty of up to $23,331 for each violation (as adjusted annually for inflation), plus three times the amount of the damages the United States sustains.  *Id.* § 3729(a)(1).  Any claims for payment resulting from a violation of the AKS, such as those at issue here, are false claims under the FCA.  42 U.S.C. § 1320a-7b(g).

11.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States and to share in any recovery.  The FCA requires the Complaint to be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.  Where, as here, the government elects to monitor rather than to join the suit, the FCA grants the Relator the authority to prosecute the action on behalf of the United States.

12.     Defendants' actions alleged in this Complaint also violate the laws of the States, each of which has enacted a false claims act analogous to the federal FCA, each of which requires compliance with the AKS as a condition of payment of Medicaid reimbursement for drugs that McKesson sold, and many of which have their own analogous anti-kickback statutes.  Specifically, McKesson's conduct violates the California False Claims Law, Cal. Gov't Code § 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.*; the Florida False Claims Act, Fla. Stat. Ann. § 68.081 *et seq.*; the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/1 *et seq.*; the Indiana False Claims and Whistleblower Protection Act, Ind. Code Ann. § 5-11-5.5-1 *et seq.*; the Iowa False

Claims Act, Iowa Code § 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437.1 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. § 167:61-a *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.*; the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.*; the Rhode Island State False Claims Act, 9 R.I. Gen. Laws § 9-1.1-1 *et seq.*; the Tennessee False Claims Act, Tenn. Code Ann. § 4-18-101 *et seq.*, and the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005 *et seq.*; and the District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq*.

13.    Based on these provisions, *Qui Tam* Plaintiff and Relator Adam Hart seeks to recover all available damages, civil penalties, and other relief for federal and State-law violations alleged in this Complaint in every jurisdiction to which McKesson's misconduct has extended.

## II.    PARTIES

14.    *Qui Tam* Plaintiff and Relator Adam Hart is domiciled in Florida. McKesson employed Mr. Hart from August 2011 until September 2014 as a Business Development Executive ("BDE") in its McKesson Specialty Health business unit. Within McKesson, BDEs are responsible for acquiring and servicing new customers.  Mr.

Hart was responsible for generating new business for McKesson among community-based oncology practices in the southeastern United States.  When Mr. Hart successfully engaged a new customer, he was also responsible for servicing that customer for the first year it did business with McKesson.  Thereafter, McKesson would assign responsibility for covering the oncology practice to a McKesson Account Executive, an employee responsible for maintaining and increasing sales to existing customers.  Even after handing off an existing customer to an Account Executive, Mr. Hart continued to receive updates about these and other business relationships through sales meetings, sales calls, requests for assistance from other McKesson personnel, and communications with his colleagues.  At quarterly and annual sales meetings, Mr. Hart additionally learned information about the sales practices of the McKesson BDEs responsible for covering the rest of the United States.  At McKesson's instruction, Mr. Hart (and the other BDEs) regularly utilized the company's suite of business-management tools to induce oncology practices to buy drugs from McKesson.

15.     Defendant McKesson Corporation is a Delaware corporation with its corporate headquarters located in Irving, Texas.  McKesson Corporation is the parent company of the other McKesson defendants, which are all wholly-owned direct or indirect subsidiaries of McKesson Corporation.

16.     Defendant McKesson Specialty Distribution LLC is a Delaware limited liability company and a wholly-owned subsidiary of McKesson Corporation.  Defendant McKesson Specialty Care Distribution Corporation is a Delaware corporation and a wholly-owned subsidiary of McKesson Corporation.  McKesson Specialty Care Distribution JV LLC (formerly known as McKesson Specialty Care Distribution Joint Venture LP) merged into McKesson Specialty Care Distribution Corporation in or around May 2013, with the latter as the surviving company.  With respect to the allegations in this Complaint, Defendants do business as McKesson Specialty Health.  On information and belief, McKesson Specialty Health, the primary wholesale supplier of specialty drugs

FIRST AMENDED COMPLAINT

to the physician practice groups that received unlawful kickbacks, is a business unit of McKesson Corporation, McKesson Specialty Care Distribution Corporation, and McKesson Specialty Distribution LLC.

17.     According to its most recent annual report, McKesson has three reportable business segments:  U.S. Pharmaceutical and Specialty Solutions; European Pharmaceutical Solutions; and Medical-Surgical Solutions.  McKesson's U.S. Pharmaceutical and Specialty Solutions business distributes (among other things) branded, generic, and specialty drugs, and "provides practice management, technology, clinical support and business solutions to community-based oncology and other specialty practices."  For the year ending March 31, 2019, McKesson Corporation reported revenues of $214.319 billion.  McKesson and its MSH business unit have sold pharmaceutical drugs in every State in the United States, have representatives with territorial responsibility covering, in the aggregate, every State in the United States, and physically conduct sales or marketing activity in every State in the United States.

## III.   <u>JURISDICTION AND VENUE</u>

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  In addition, 31 U.S.C. § 3732(b) confers jurisdiction on this Court over the State-law claims asserted in Counts 2 through 31 of this Complaint.

19.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in, reside, and/or transact or have transacted business in this District.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this District.  At all times relevant to this Complaint,

FIRST AMENDED COMPLAINT

Defendants regularly conducted substantial business, maintained employees, and/or made significant sales in this District.  In addition, statutory violations of the AKS and the FCA, as alleged in this Complaint, occurred in this District.

## IV.   FEDERAL AND STATE-FUNDED HEALTH CARE PROGRAMS

### A.   Medicare

21.     Medicare is a federally funded health-insurance program primarily benefitting the elderly.  The allegations in this Complaint concerning Medicare relate principally to Medicare Part B, the Voluntary Supplemental Insurance Plan.  Medicare Part B covers the cost of services that physicians and certain other health care providers perform if the services are medically necessary and the provider personally and directly provides them.

22.     Medicare pays physicians only for services it considers "reasonable and necessary for the diagnosis or treatment of illness or injury."  Social Security Act, 42 U.S.C. § 1395y(a)(1)(A).  Physicians who wish to participate in the Medicare program must ensure that services are provided "economically and only when, and to the extent, medically necessary."  *Id.* § 1320c-5(a).

23.     The Centers for Medicare and Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services ("HHS"), administers the Medicare program.

### B.   Medicaid

24.     Medicaid was created in 1965 under Title XIX of the Social Security Act. The federal government and States that participate in the program jointly fund it. Participating States receive federal money to provide certain medical services to the poor. 42 U.S.C. § 1396 *et seq.*  The federal government reimburses States each quarter for a percentage of their expenditures in providing specific types of "medical assistance" under States' Medicaid plans.  *Id.* § 1396b(a)(1).

25.     Individuals may be "dual eligible" for both the Medicare program (as the primary insurer) and the Medicaid program (as the secondary insurer).

26.     Medicare beneficiaries known as "qualified Medicare beneficiaries" ("QMBs") are elderly or disabled persons who qualify for Medicare but who—though not poor enough to qualify for Medicaid—cannot afford to pay Medicare Part B's premiums, deductibles, and copayments.  *Id.* § 1396d(p)(1).  Federal law requires State Medicaid programs to pay the Medicare costs QMBs incur that the federal government does not reimburse.  *Id.* §§ 1396a(a)(10)(E)(i), 1396d(p)(3).  Since Medicare Part B pays only 80% of the approved charge for covered services, State Medicaid programs are responsible for paying the remaining 20% of a QMB's copayments if the QMB lacks private insurance to cover those expenses.

**C.     Other Federal and State-Funded Health Care Programs**

27.     The federal government administers other health care programs that include, but are not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

28.     TRICARE, which the United States Department of Defense administers, is a health care program for individuals and dependents affiliated with the armed forces.

29.     CHAMPVA, which the United States Department of Veterans Affairs administers, is a health care program for the families of veterans with 100% service-connected disabilities.

30.     The Federal Employee Health Benefit Program, which the United States Office of Personnel Management administers, provides health insurance for federal employees, retirees, and their survivors.

31.     The States have programs providing health care benefits to certain individuals based on those individuals' financial need, employment status, or other factors.  This Complaint refers to those programs as "State-funded health care programs."

V.     **APPLICABLE LAW**

   A.     **The Anti-Kickback Statute Prohibits Offering Financial Incentives to Induce Physicians to Prescribe Drugs Paid for with Federal Funds**

   32.     Congress enacted the AKS out of concern that kickbacks to physicians and other health care providers would result in the recipients providing goods or services to patients in response to economic self-interest, rather than untainted medical judgment. Underlying the statute is an understanding that corrupted medical judgment may lead to physicians providing goods or services that are medically unnecessary, unduly expensive, of poor quality, or even harmful to a vulnerable patient population.  The AKS addresses the substantial risk that kickback-tainted medical decisions may increase costs to federal health care programs and beneficiaries, encourage the overutilization of goods and services, and result in unfair competition among vendors of government-reimbursed health care goods and services.  The AKS also benefits the public fisc because it excludes kickbacks and other inducements whose value may not be passed on to the government from the market for government-reimbursed health care services and products, thus ensuring that decisions between competing health care services are made solely on the basis of merit and price.  The AKS's prohibition against the payment of kickbacks applies regardless of whether a particular kickback actually gives rise to the effects Congress feared.

   33.     The AKS prohibits any individual or entity from "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to purchase . . . or arrange for or recommend purchasing . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b)(2).  Under the statute, companies that sell pharmaceutical drugs may not offer or pay any remuneration—which includes providing anything of value—to induce physicians or others to purchase, order, or recommend

pharmaceuticals for which a federally funded health care program may pay in whole or in part.

**B.**   **Physician Practices Must Comply With the Anti-Kickback Statute to Participate in and Receive Payment from Federal and State-Funded Health Care Programs**

34.   Compliance with the AKS is a condition of payment under federally funded health care programs.  A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. § 1320a-7b(g).  Such a claim is false or fraudulent as a matter of law, as well as because providers of such services are ineligible to participate in government health care programs and because the government would not have paid such claims had it known of the kickbacks.

35.   The States also have enacted statutes prohibiting kickbacks in connection with State Medicaid services.  Pursuant to State statutes, regulations, and other administrative materials, the States have made compliance with both federal and State anti-kickback statutes and rules a prerequisite to a physician's right to receive or retain reimbursement payments from State-funded health care programs.  *See* Cal. Welf. & Inst. Code §§ 14107.2(a), (b), 14107.11(a)(2); 10 Colo. Code Regs. § 2505-10-8.076.1(7)(b), (j); Conn. Gen. Stat. §§ 53a-161c, 53a-161d; Conn. Agencies Regs. § 17b-262-531(b); Del. Code Ann. tit. 31, § 1005; D.C. Code § 4-802(c)–(d); Fla. Stat. Ann. §§ 409.907, 409.920(2)(e); Haw. Code R. § 17-1739.1-3(c); 305 Ill. Comp. Stat. 5/8A-3(b)(2), (c)(2); Ind. Code Ann. §§ 12-15-22-1, 12-15-24-1; 405 Ind. Admin. Code 1-1.4-4(a)(6); Iowa Code § 249A.47(1)(f); La. Rev. Stat. § 46:438.2(A)(2); Mass. Gen. Laws ch. 118E, § 41; 130 Mass. Code Regs. 450.249(B)–(C), 450.261; Mich. Comp. Laws § 400.604; Minn. Stat. §§ 256B.064(1a)(7), 256B.064(1b); Minn. R. 9505.2165(4)(C), 9505.2215(1)(A); Mont. Code Ann. § 45-6-313(1)(b)(i); Mont. Admin. R. 37.85.406(10), 37.85.501(1)(h), (k); Nev. Rev. Stat. Ann. § 422.560(1)(a); N.H. Rev. Stat. Ann. § 167:58–61-a, 167:61-a(I)(i); N.J. Stat. Ann. § 30:4D-17(c); N.J. Admin. Code § 10:49-5.5(a)(17); N.M. Stat.

Ann. § 30-44-7(A)(1); N.M. Code R. §§ 8.302.1.11, 8.351.2.9-13; N.Y. Soc. Serv. Law § 366-d(2); N.Y. Comp. Codes R. & Regs., tit. 18, §§ 515.2(b)(5), 518.1–9; N.C. Gen. Stat. §§ 108A-63(g), (h), 108A-70.12; 10A N.C. Admin. Code 22F.0301(5); Okla. Stat. tit. 56, § 1005(A)(6); 5 R.I. Gen. Laws § 5-48.1-3(a), (b); 40 R.I. Gen. Laws § 40-8.2-3(a)(2); Tenn. Code Ann. § 71-5-118; Tex. Hum. Res. Code Ann. § 32.039(b), (c)(1); Tex. Penal Code Ann. § 35A.02(a)(5); Va. Code Ann. § 32.1-315; Wash. Rev. Code § 74.09.240; Wash. Admin. Code § 182-502-0016(1); *see also* Florida Medicaid Provider Handbook; Georgia Medicaid Manual; Hawaii State Medicaid Manual; Illinois Medicaid Handbook; Indiana Medicaid Provider Manual; Louisiana Medicaid Provider Manual; Michigan Medicaid Provider Manual; Minnesota Medicaid Provider Manual; Nevada Medicaid Services Manual; Oklahoma Medicaid Provider Billing and Procedure Manual; Virginia Medicaid Provider Manual.

36.     Many States, including California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, Washington, and the District of Columbia, also require Medicaid providers to enter into provider agreements with the State that specifically require compliance with all applicable federal and State Medicaid laws (sometimes with specific emphasis on the AKS) and/or condition the right to payment on compliance with those laws.

37.     Compliance with the AKS is material to the government's payment decisions.  Congress explicitly provided that claims for payment submitted in violation of the AKS "constitute[] . . . false or fraudulent claim[s] for purposes of [the FCA]," 42 U.S.C. § 1320a-7b(g), meaning that materiality is established as a matter of law in FCA cases predicated on violations of the AKS.

38.     In addition, the United States routinely enforces the AKS through litigation and recovers damages for the submission of kickback-tainted claims, including

in cases that, like this one, involve the provision of valuable business services in exchange for purchases, referrals, or recommendations of government-reimbursed health care goods or services.  *See, e.g.*, government settlements in *United States ex rel. Dorsa v. Miraca Life Scis., Inc.*, No. 3:13-cv-01025 (M.D. Tenn.) (in exchange for referrals, defendant offered free or deeply discounted training and consulting services); *United States ex rel. Hayes v. Covidien, Inc.*, No. 3:14-cv-01511 (N.D. Cal.) (in exchange for prescriptions, defendant provided practice development and market development support); *United States ex rel. Ameer v. Philips Elecs. N. Am.*, No. 2:14-cv-02077 (D.S.C.) (in exchange for recommendations of their products, defendant manufacturers provided business services to help vendors obtain resupply orders).

## VI.    FACTUAL BACKGROUND

39.    Treatment for chronic, serious, or life-threatening medical conditions, such as cancer, frequently includes the use of certain drugs referred to as "specialty drugs."  Specialty drugs generally are complex to manufacture, demand special handling and administration, require a health care provider to administer them and to provide ongoing clinical support, and often are more expensive on a per-unit and per-patient basis than traditional drugs.

40.    Pharmaceutical wholesale distributors like McKesson buy specialty drugs from manufacturers and resell those drugs to their customers, including community oncology practices.

41.    Community oncology practices, which provide services in an office setting (as distinguished from practices that provide cancer care in a hospital setting), acquire specialty drugs in two ways.  Practices can arrange to obtain drugs from a specialty pharmacy, which then bills a patient's insurance company directly.  Alternatively, practices can buy specialty drugs from a drug wholesaler like McKesson, provide those drugs to patients, and then bill the patient's insurer—a process sometimes referred to as

"buy-and-bill."  This Complaint concerns McKesson's provision of unlawful inducements to "buy-and-bill" oncology practices.

42.     Medicare Part B reimburses community oncology practices for the drugs they provide to eligible beneficiaries.  Since 2005, Medicare has calculated payments for prescription drugs under Part B using the average sales price ("ASP") reimbursement methodology.  The ASP is a manufacturer's aggregate sales price of a drug to all purchasers in the United States in a calendar quarter, divided by the total number of units of the drug the manufacturer sold in that same quarter, net of price concessions.

43.     To obtain payment for drugs under Medicare Part B, physician practices submit claims to Medicare contractors using Healthcare Common Procedure Coding System ("HCPCS") codes, each of which defines the drug's name and the amount of the drug represented by one unit of the code.

44.     For the majority of time since CMS implemented the ASP methodology, CMS has set the Medicare-approved price for drugs under Part B at 106% of the volume-weighted ASP for the drugs associated with each HCPCS code.  Congress imposed a 2% payment reduction on the Medicare-approved amount for Part B claims dated on or after April 1, 2013.

45.     CMS pays 80% of the Medicare-approved price for the drugs eligible beneficiaries receive.  The remaining 20% either is paid by Medicare beneficiaries or is covered by insurance those beneficiaries purchase for this purpose.  For QMB beneficiaries without insurance who cannot afford to pay the remaining 20%, State Medicaid (including the State-funded health care programs at issue here) pays the remaining 20% payment.

46.     McKesson, through its MSH business unit, is a wholesale distributor of specialty drugs to community oncology practices and other specialty-care providers.  As of April 2014, MSH's annual revenues exceeded $9 billion.

FIRST AMENDED COMPLAINT

47.     While MSH operates several lines of business, this Complaint concerns its business of providing specialty pharmaceuticals and services to community oncology practices.  MSH's oncology business generated $7 billion of MSH's $9 billion in annual revenues as of April 2014, making it MSH's largest line of business by revenue.  MSH's oncology business is split into two divisions:  the U.S. Oncology Network ("USON") and what McKesson calls the "open market" division.

48.     Relator's allegations concerning the illegal inducements McKesson offers to physician practices pertain only to the "open market" division in which Relator worked as a BDE.  They do not extend to the sales and marketing practices of USON, which was a separate business merged into MSH that operated as a separate division with a distinct business model, customer base, sales team, and management structure.

49.     MSH's "open market" division is a traditional drug wholesaler and distributor.  MSH purchases specialty drugs from their manufacturers and sells them to medical practices willing to buy them at a marked-up rate.  In order to induce actual and potential "open market" customers to purchase these specialty drugs from McKesson (instead of its competitors), MSH gives those customers, free of charge, the Margin Analyzer and the Regimen Profiler—the two valuable business-management tools at issue in this Complaint.

## VII.   MCKESSON'S USE OF BUSINESS-MANAGEMENT TOOLS TO INDUCE PHARMACEUTICAL DRUG PURCHASES IN VIOLATION OF THE ANTI-KICKBACK STATUTE

50.     The health of McKesson's specialty-drug distribution business depends entirely on the decision oncology practices make every day to purchase cancer drugs from McKesson rather than from its competitors.  To develop and maintain an edge over those competitors, for several years McKesson has given, and continues to give, its "open market" customers valuable business-management tools at no cost.  These tools, which include the Margin Analyzer and the Regimen Profiler, have significant, independent value for which practices would otherwise pay substantial sums of money.

51.     Rather than compete primarily on price with other specialty drug wholesalers, McKesson instead elected to offer the Margin Analyzer and the Regimen Profiler free of charge to oncology practices that committed to use McKesson for a substantial amount of their specialty drug purchases.  Because McKesson knowingly provides these valuable tools to induce physician practices to purchase drugs from it, McKesson's conduct violates the federal AKS and similar State laws.

A.      **The Margin Analyzer**

1.      The Margin Analyzer Is a Valuable Business-Management Tool

52.     Since approximately 2011, McKesson sales representatives have offered McKesson's customers complimentary access to the Margin Analyzer.  Brian Larson, McKesson Specialty Health's Director of Clinical Services and a registered pharmacist, developed the Margin Analyzer and continued to maintain it for McKesson at least through June 2015.

53.     Exhibit 1, attached hereto, is an excerpt of a Margin Analyzer for the fourth quarter of 2012 that McKesson developed for Summit Cancer Care in Savannah, Georgia ("Summit Cancer Care").  McKesson provided the Margin Analyzer, free of charge, on a quarterly basis to scores of additional customers, including but not limited to the following, among others:  Premier Oncology Center (Naples, FL), Spalding Oncology (Griffin, GA), Florida Medical Clinic (Land O' Lakes, FL), Noor Merchant, MD (Sebastian, FL), Suncoast Medical Clinic (St. Petersburg, FL), Oncology Hematology Associates of West Broward (Tamarac, FL), ICON Oncology (Jacksonville, FL), Emerald Coast Cancer Center (Ft. Walton Beach, FL), Citrus Hematology and Oncology (Inverness, FL), Central Florida Cancer Institute (Davenport, FL), and Alabama Cancer Care (Gadsden, AL).

54.     The Margin Analyzer is a business-management tool that analyzes "the economic impact of the clinical decisions being made in [a] practice" and recommends what "therapeutically interchangeable" drugs a physician practice should prescribe to

-17-

FIRST AMENDED COMPLAINT

maximize its profit.  Exhibit 2, attached hereto, is a McKesson "sell sheet" describing the benefits of the Margin Analyzer.  McKesson customizes the Margin Analyzer for each physician practice and updates it at each iteration with the physician practice's drug-purchase data and with drug-price data from Medicare and other payers.

55.    The Margin Analyzer enables a physician practice to scrutinize its profitability on every drug it purchases from McKesson.  The cornerstone of its power to "optimiz[e] revenue opportunities" is the Therapeutic Interchange Calculator ("TIC"), which is itself the product of extensive software coding and development efforts by McKesson.  Ex. 2.

56.    To create the Margin Analyzer's TIC for a customer, McKesson begins with a generic template originally created by Brian Larson.  On a quarterly basis, McKesson imports the new Medicare fee schedule into the Margin Analyzer template. This information details the amount Medicare reimburses the physician practice for each drug the practice prescribes.

57.    McKesson then obtains information detailing a given customer's drug purchases for the most recent quarter.  McKesson sales representatives generally extract this data from McKesson's SAP Business Warehouse database, which includes the physician practice's cost of acquiring each drug from McKesson (inclusive of any discounts the practice gets from the manufacturer and McKesson), as well as the total amount of each drug the practice purchased.  McKesson's SAP database produces two reports—the "Customer Material Price-Margin Analyzer" and the "Purchase Material History Rollup-Margin Analyzer"—that supply the necessary purchase-history data for McKesson sales representatives to import into the Margin Analyzer.  For new customers (for whom McKesson does not already have data), McKesson must obtain utilization data from the customer itself.

58.    If the customer wishes, McKesson also incorporates into the Margin Analyzer the fee schedule of any commercial insurer (e.g., Blue Cross/Blue Shield,

Cigna, Aetna, Humana, United Healthcare Group, or Coventry) that reimburses the customer for its specialty drug purchases.  McKesson must obtain this information directly from the customer.  This information allows McKesson to calculate non-Medicare drug-reimbursement rates applicable to the particular customer.

59.     After these datasets are loaded, the Margin Analyzer automatically calculates:  (a) the rates at which particular drugs were reimbursed to the customer in the prior quarter, the rate at which they will be reimbursed in the upcoming quarter, and the aggregate reimbursement amount for each of those drugs during both periods; and (b) the rates at which other, therapeutically interchangeable drugs would have been reimbursed to the customer by government health care programs and private insurers (if the customer has provided private-insurance data), and the aggregate reimbursement amount the customer could have obtained had it prescribed those other, therapeutically interchangeable drugs.

60.     The Margin Analyzer groups these calculations by "therapeutic interchange" category.  Broadly speaking, the TIC identifies drugs within certain drug categories that McKesson claims are therapeutically interchangeable with one another. The drug categories for which McKesson has developed therapeutic-interchange lists include:

- Antiemetics, used to treat vomiting and nausea;

- Bone-metastases drugs, used to relieve pain and treat complications if cancer has spread to bone;

- Osteoporosis drugs, used to treat bone-density loss;

- Folates, used to treat or prevent the toxic effects of certain drugs used to treat bone cancer;

- Erythropoiesis-stimulating agents, used to treat anemia;

- Colony-stimulating factors, used to support white-blood-cell levels and strengthen the immune system;

FIRST AMENDED COMPLAINT

- Intravenous immunoglobulins, used to support the development of antibodies in the immune system to prevent infections;

- Parenteral irons, used to treat iron-deficiency anemia;

- Prostate drugs, used to treat symptoms of prostate cancer; and

- Anticoagulants, used to treat venous thromboembolism, which is the formation of a blood clot in a deep vein.

61.     For each of these drug categories, the Margin Analyzer contains a sheet that compares a physician practice's purchase volume, acquisition cost, and profit margin for every therapeutically interchangeable drug in that category.  In each category-specific sheet, the Margin Analyzer allows a practice to model how much more money it could make if it were to shift its purchases to the highest-margin drug in the category.  It does this by computing the difference between a physician practice's aggregate margins on all drugs in a given category (in a cell called "Current:  Annual Net Profit") with a forecast of the practice's profit if it were to prescribe just the highest-margin drug in that category (in a cell titled "Forecast:  Annual Net Profit").

62.     The Margin Analyzer compiles the analyses it performs on each drug category on a summary sheet entitled "TIC Exec Sum."  This sheet sums up how much profit a practice can earn if it shifts its prescriptions to the most lucrative drug in each category.

63.     The Margin Analyzer only purports to compare "[c]linically equivalent drugs . . . against each other to observe which products make the most financial sense." Ex. 3 (McKesson sales training document providing information about "elevator pitches" and "talking points").  It does not evaluate the comparative medical benefits of alternative drugs.  The Margin Analyzer's sole function is to identify which among several equivalent drugs will earn a physician practice—and, not coincidentally, McKesson—the most money.  The TIC is the primary way McKesson helps a physician practice "maximize [its] economics," *id.*, and optimize "revenue opportunities."

64.     As a general matter, McKesson deploys the Margin Analyzer in three situations.  First, McKesson arms its BDEs and Account Executives with the Margin Analyzer in connection with attempts to win new business or to extend existing business arrangements.  McKesson sales personnel emphasize the unique insights offered by the Margin Analyzer, and how it can be used to increase practice group revenue while reducing administrative costs.  That allows McKesson to win business over its competitors without competing primarily on price.  Indeed, MSH's sales training highlights the need to convince actual and prospective customers that they should not view McKesson as a cost to their practice, but rather should view McKesson as a "consultant" that can help them increase profit.  McKesson acknowledged in internal communications that it has practice group customers who refuse to leave MSH for lower cost providers of specialty drugs because those practices would lose access to the Margin Analyzer in the event they did so.

65.     The second way in which McKesson deploys the Margin Analyzer is in the context of "Quarterly Business Reviews," sales meetings McKesson uses to provide its existing physician practice group customers free financial and business-management advice every three months.  Quarterly Business Reviews are face-to-face meetings between McKesson's BDEs or Account Executives and their assigned physician-practice customers.  When CMS releases its Medicare Part B drug-reimbursement rates (which it does four times a year), McKesson generates each customer's customized Margin Analyzer and sends them to the customers.  McKesson additionally sends its sales force out to physician practices with a detailed analysis of the practice's finances and business operations, and as part of these Quarterly Business Reviews will walk the customer through the Margin Analyzer.  If a McKesson sales representative is not comfortable discussing the clinical aspects of the drugs at issue, McKesson designates a "clinical specialist" (usually a trained pharmacist) to accompany the sales representative to the meeting.  McKesson uses the Margin Analyzer during the Quarterly Business Review to

evaluate the practice's drug-purchasing history from the previous quarter and to "identify top drugs by . . . margin," and suggest how customers can optimize revenue opportunities by altering the mix of drugs they prescribe going forward.  McKesson exploits the tools provided by the Margin Analyzer to steer the physician practice to prescribe the highest-margin drugs in the coming quarter.  *See* Ex. 3.  Physician practices are especially grateful for the free financial and business-management advice McKesson gives them each quarter because of the significant value of the service.

66.    Finally, McKesson deploys the Margin Analyzer in campaigns to promote new drugs or new pricing terms.  This occurs when a new, high-margin drug comes to market, or an existing drug's price terms or reimbursement rates improve considerably to create a new, high-margin "opportunity."  When that happens, McKesson equips its sales team with Margin Analyzers to show practices how to monetize the "opportunity" by purchasing the higher-margin drug over its therapeutically interchangeable competitors.

67.    Examples of these uses of the Margin Analyzer are described below.

> 2.    <u>McKesson Uses Margin Analyzer To Win or To Maintain Business</u>

68.    Since at least 2011, McKesson primarily has offered specialty drugs through one of two basic arrangements.  First, oncology practices could purchase individual specialty drugs from McKesson without making any commitments, leaving them free to meet their remaining needs from other wholesale distributors (*i.e.*, McKesson's competitors).  Second, McKesson had commitment programs known as Onmark Select, Prime Membership, and McKesson Value Program, or "MVP."  To enroll in the lowest tier of these commitment programs, Onmark Select, customers were required to use McKesson as their "primary wholesale supplier" of branded and generic drugs.  Under the Prime Membership and MVP programs, physician practice group customers were generally required to commit to purchase approximately 90% of their branded drugs and either 90% or 95% of their generic drugs from McKesson.  Customers

who joined Onmark Select, Prime, or MVP entered into contracts with McKesson Specialty Care Distribution Joint Venture, LP or McKesson Specialty Care Distribution Corporation.

69.     Critically, with few (or no) exceptions, McKesson offered the value-added services such as the Margin Analyzer and the Regimen Profiler *only* to physician practices that contracted to join the Onmark Select, Prime, or MVP programs.  When pitching new or existing business, there was an explicit quid pro quo involved:  in order to obtain (or to maintain) access to these valuable programs, an oncology practice group had to commit to use McKesson either as its primary wholesale supplier (Select) or for substantially all of its branded and generic drug needs (Prime and MVP).  Stated another way, McKesson offered the Margin Analyzer (and the Regimen Profiler) in order to induce oncology practices to commit to purchasing specialty drugs from McKesson.

70.     When physician practice groups that were moving or considering moving their business to McKesson's competitors sought to purchase or otherwise maintain access to the Margin Analyzer on a stand-alone basis, McKesson refused.  Only physician practice groups that committed to source a substantial majority of their specialty drugs through McKesson could access this valuable tool.  For instance, when one practice group, Hematology Oncology of the Treasure Coast, informed McKesson that it intended to end its purchase commitment with McKesson, McKesson told this practice group that it would lose access to Margin Analyzer as a result.  McKesson executives, including its National Vice President of Sales and Account Management and its South Region Vice President of Sales, emphasized that the Margin Analyzer was a key tool both for obtaining purchasing commitments from new customers and for creating "stickiness"—the ability to retain customers on the basis of the value of the business tools that McKesson provided to customers for free.

71.     Each of the practices identified in Paragraph 53, *supra*, were offered the Margin Analyzer and/or the Regimen Profiler for free as an inducement to make a

FIRST AMENDED COMPLAINT

purchase commitment from McKesson.  During the sales pitch to these practices, McKesson populated the Margin Analyzer with the practices' specific drug utilization information to demonstrate the utility of the Margin Analyzer.  Each of these physician practices signed purchase commitments with McKesson and informed McKesson that the Margin Analyzer and, in some instances, the Regimen Profiler were key components of their decision to commit to buying specialty drugs from McKesson.  Scores of other providers across the country were also offered the Margin Analyzer and the Regimen Profiler for free as an inducement to purchase drugs from McKesson, and subsequently signed purchase commitments.

        3.      <u>McKesson's Quarterly Use of the Margin Analyzer to Increase Physician Practices' Drug Profit</u>

72.    As described above, McKesson updated the Margin Analyzer every three months following CMS's issuance of its quarterly Medicare Part B drug-reimbursement rates and used it to assist McKesson's customers in maximizing their profit from the prescription of drugs.  This section details the use of the Margin Analyzer with Summit Cancer Care, the exemplar customer for whom Exhibit 1 was prepared.  McKesson's use of the Margin Analyzer with Summit Cancer Care was similar to, and is representative of, its use of the Margin Analyzer with the other customers identified above.

73.    In the second quarter of 2012, McKesson presented Summit Cancer Care with a Margin Analyzer report.  McKesson's analysis revealed that in the first three months of 2012, Summit Cancer Care purchased 905 doses of antiemetic drugs used to treat vomiting and nausea.  *See* Ex. 4 (excerpt of McKesson Quarter 2 2012 Margin Analyzer for Summit Cancer Care).  Thirty of those doses, or 3% of the total doses of antiemetics Summit Cancer Care purchased, were of a drug called Aloxi.  That quarter, Summit Cancer Care purchased each dose of Aloxi for $177.61; CMS's reimbursement rate for each dose provided to a Medicare beneficiary was $184.41.  Accordingly,

Summit Cancer Care earned a profit margin of $6.80 for each dose of Aloxi it prescribed to its Medicare patients.

74.     The remaining antiemetics Summit Cancer Care purchased between January and March 2012 were 875 doses of a drug called Ondansetron. Summit Cancer Care paid $1.42 for each dose of Ondansetron, for which Medicare reimbursed $1.97. Accordingly, Summit Cancer Care earned a profit margin of $0.55 for each dose of Ondansetron.

75.     The Margin Analyzer calculated that Summit Cancer Care obtained an annualized net profit of $2,734 from Medicare on its existing mix of antiemetics.

76.     The Margin Analyzer, however, showed Summit Cancer Care how it could maximize revenue by shifting its prescriptions of antiemetics entirely to Aloxi—which would result in $6.80 in profit to Summit Cancer Care per dose, as opposed to $0.55 in profit per dose for Ondansetron. The Margin Analyzer calculated that Summit Cancer Care could instead earn an annualized net profit of $24,616 on its prescriptions of antiemetic drugs to Medicare beneficiaries by prescribing only Aloxi. In other words, by prescribing Aloxi rather than Ondansetron—a change that, according to McKesson, had no therapeutic benefit— Summit Cancer Care could increase its profitability on antiemetic drugs by more than 800%. If it did so, Medicare's spending on antiemetics at this single oncology practice would increase 2200% (as it would be paying $184.41 per dosage rather than $1.97 for those patients previously prescribed Ondansetron) for as long as reimbursement rates for the drugs in question stayed the same. Likewise, for patients for whom federal or State Medicaid paid the remaining 20% payment, the Medicaid cost would increase from $0.49 per dose of Ondansetron to $46.10 per dose of Aloxi.

77.     In the same quarter, McKesson suggested a similar change in Summit Cancer Care's drug-distribution mix for parenteral irons, a category of drugs used to treat anemia. The Margin Analyzer listed five therapeutically interchangeable drugs: Infed,

Dexferrum, Nulecit, Feraheme, and Venofer.  The Margin Analyzer then compared the acquisition cost and Medicare reimbursement per dose:

| Drug | Acquisition cost per dose | Medicare reimbursement per dose |
| --- | --- | --- |
| Infed | $346.75 | $361.94 |
| Dexferrum | $235.62 | $241.94 |
| Nulecit | $351.89 | $309.28 |
| Feraheme | $559.18 | $647.70 |
| Venofer | $320.00 | $290.00 |

78.     In the first quarter of 2012, Summit Cancer Care purchased 45 doses of Infed and no other parenteral irons from its wholesale supplier.  McKesson advised that if Summit Cancer Care were to change this mix so that it prescribed Infed 20% of the time and Feraheme the remaining 80% of the time, Summit Cancer Care's annualized net profit on parenteral irons would increase 386%, from $2,734 to $13,294 a year.  Medicare's payments for parenteral irons would increase by 63% (as it would be paying $647.70 per dose for Feraheme versus $361.94 per dose for Infed), as long as reimbursement rates for the drugs in question stayed the same, despite the absence of any claimed medical benefit from the change.

79.     The Margin Analyzer repeated this analysis for each "therapeutically interchangeable" category of drugs that Summit Cancer Care prescribed.

80.     The "TIC Exec Sum" showed Summit Cancer Care's managers that, across all drug categories, if the practice "optimized" its existing drug purchases— changing its drug mix to prescribe higher margin drugs among therapeutically interchangeable alternatives—Summit Cancer Care could nearly double its profit on its pharmaceutical drug sales.

81.     The Margin Analyzer also includes a "cheat sheet" feature that illustrates the TIC and identifies the most profitable drug among therapeutically interchangeable

alternatives for each specific payment source, based on the quarter's Medicare reimbursement rates and the current rates of commercial insurers.  On occasion, McKesson suggests that physician practices post the chart, which it calls the "cheat sheet," in locations where doctors make prescription decisions.

82.    For example, McKesson developed the following "cheat sheet" for Summit Cancer Care for the last quarter of 2012:



| Category | Drug | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AntiEmetics | ALOXI | | X | | | | | |
| | GRANISETRON | X | | | | X | | |
| | ONDANSETRON | | | X | X | | X | X |
| Bone Health | PAMIDRONATE | X | X | X | | X | X | X |
| | ZOMETA | | | | X | | | |
| | XGEVA | | | | | | | |
| | PROLIA | | | | | | | |
| ESA's | ARANESP | X | | X | | X | | X |
| | PROCRIT | | X | | X | | X | |
| CSF's | NEUPOGEN 300 | | | | | | | |
| | NEUPOGEN 480 | X | X | X | | X | X | X |
| | LEUKINE | | | | | | | |
| | NEULASTA | | | | X | | | |
| Irons | INFED | | | | | | | X |
| | DEXFERRUM | X | X | X | | X | X | |
| | SOD FERRIC GLUC | | | | | | | |
| | FERRAHEME | | | | X | | | |
| | VENOFER | | | | | | | |
| Prostate | LUPRON | X | X | X | | X | X | X |
| | ELIGARD | | | | X | | | |
| | FIRMAGON | | | | | | | |
| | TRELSTAR | | | | | | | |
| | ZOLADEX | | | | | | | |
| AntiCoag | FRAGMIN | | X | X | X | | X | |
| | ENOXAPARIN | X | | | | X | | X |
| | ARIXTRA | | | | | | | |

Ex. 1.

FIRST AMENDED COMPLAINT

83.     As the "cheat sheet" above demonstrates, McKesson uses the Margin Analyzer to induce doctors to prescribe different drugs for the same condition based on the identity of the payer, and, in the case of Medicare, to submit those claims to CMS for payment.  In this example, McKesson advised Summit Cancer Care that a patient who required an antiemetic drug to treat vomiting and nausea in the final three months of 2012 should be prescribed Aloxi if Cigna paid for her care, Granisetron if Blue Cross Blue Shield or Humana were responsible for it, and Ondansetron if Medicare, Aetna, United Health Care, or Coventry covered the costs.  In other words, McKesson recommended that Summit Cancer Care make drug-prescription decisions on the basis of which drug would be most profitable for the physician practice, not on which would be the most beneficial for the patient.

84.     At times, the specific drugs McKesson promoted changed from quarter to quarter due to reimbursement-rate fluctuations.  This practice is evident in the "cheat sheet" McKesson provided to Summit Cancer Care for the first quarter of 2013, which immediately followed the "cheat sheet" described above.  McKesson's first-quarter 2013 "cheat sheet" was as follows:



Ex. 5 (excerpt of McKesson Quarter 1 2013 Margin Analyzer for Summit Cancer Care).

85.     As a comparison of the two cheat sheets reveals, McKesson encouraged Summit Cancer Care to prescribe Ondansetron to Medicare patients in the fourth quarter

FIRST AMENDED COMPLAINT

of 2012, but to prescribe Granisetron (another antiemetic that McKesson believed to be "therapeutically interchangeable" with Ondansetron) to the same Medicare patients in the first quarter of 2013, without regard to whether there could be adverse effects from such an abrupt change in medications.  Similarly, over the same period, McKesson changed its recommendations for the prescription of bone-health drugs and colony-stimulating factors to Medicare patients.

86.    The above description of how McKesson used the Margin Analyzer with Summit Cancer Care is a representative example of how McKesson used the Margin Analyzer with hundreds of its physician-practice customers.  Every time that McKesson provided the Margin Analyzer tool to a physician practice group free of charge, McKesson violated the AKS and caused that practice group to submit false claims to Medicare, other federal health care programs, and to State-funded health care programs.

4.    McKesson's Use of the Margin Analyzer to Encourage Customers to Prescribe New Drugs and Drugs with New Pricing Terms

87.    As noted above, McKesson also deploys the Margin Analyzer in campaigns to promote new drugs or new pricing terms.  One example of McKesson's use of the Margin Analyzer to support drug-specific campaigns is its 2013 rollout of new pricing for Fusilev, a folate analog indicated to diminish the toxicity and counteract the effects of certain primary cancer-treatment drugs.

88.    Before 2013, physician-practice customers who prescribed Fusilev to Medicare patients lost money on the drug if they purchased it from McKesson.  Because of the high price at which McKesson acquired Fusilev from its manufacturer, Spectrum Pharmaceuticals, the price McKesson charged its customers exceeded the Medicare reimbursement rate for the drug.  As a result, prior to 2013, McKesson's physician-practice customers usually prescribed Leucovorin (which, according to McKesson, is "therapeutically interchangeable" with Fusilev) rather than Fusilev.

89.     In 2013, Spectrum Pharmaceuticals changed its sale terms and began to offer rebates on Fusilev that resulted in lower prices to both McKesson and physician practices.  The price changes enabled both McKesson and its customers to make a substantial profit on Fusilev administered to Medicare beneficiaries (and participants in several private insurance plans).

90.     Leucovorin was, and remains, far cheaper than Fusilev, and, according to McKesson itself, is "therapeutically interchangeable" with Fusilev.  Nonetheless, because both McKesson and its physician-practice customers could profit greatly from the medically unnecessary switch from Leucovorin to Fusilev, in 2013, McKesson launched a coordinated campaign to "convert" oncology practices from prescribing Leucovorin to prescribing Fusilev, using the Margin Analyzer as their primary tool.  McKesson equipped its representatives with the "Fusilev Calculator," a drug-specific variant of the Margin Analyzer designed to quantify the additional revenue that physician practices could generate if they shifted prescriptions from Leucovorin to Fusilev.

91.     The Fusilev Calculator showed that McKesson sold its customers 700-milligram doses of Leucovorin for $59.14 per dose, which Medicare reimbursed at $65.62 per dose, resulting in a spread—a profit margin to the physician practice—of $6.48 per dose.  (McKesson itself acquired Leucovorin for $56.50 per dose, for a McKesson unit profit margin of $2.64 per dose.)  *See* Ex. 6 (copy of McKesson Fusilev Calculator).  By contrast, the Fusilev Calculator showed that McKesson charged its customers $1,190 for an equivalent dose of Fusilev (350 milligrams), and that Medicare reimbursed those customers $1,232.91 per dose, for a spread of $42.91 per dose.  Thus, the Fusilev Calculator showed that a physician practice could make approximately eight times as much in profit on a dose of Fusilev prescribed for a Medicare beneficiary as it could make on a dose of Leucovorin.

92.     The same Fusilev Calculator indicated that McKesson itself would make a unit profit of $177.73 per dose of Fusilev, or 67 times the profit it would make on

Leucovorin.  But the Fusilev Calculator stated, in ALL Caps and bold writing, that the calculator columns highlighting McKesson's additional revenue should be deleted before sharing with the customers.

93.     If the physician practice accepted the Fusilev Calculator's recommendation to switch to prescribing Fusilev rather than Leucovorin, CMS would pay $933.83 more per dose (as the actual amount Medicare pays a physician practice is 80% of CMS's established reimbursement rate).  In other words, Medicare would spend almost 19 times as much as it would pay for an equivalent dose of Leucovorin—even though the two drugs were, according to McKesson itself, "therapeutically interchangeable."

94.     The goal of McKesson's campaign was to get all of its customers to buy Fusilev instead of Leucovorin.  Achieving this goal would translate into financial rewards for McKesson and the physician practices to whom it sold the drug, but it would come at a significant cost to the Medicare program, as well as to Medicare beneficiaries who would experience a substantial hike in their 20% coinsurance responsibility.  McKesson tracked the progress of its sales personnel in spreadsheets, highlighting the oncology practices that had agreed to change their prescription behavior and identifying those that still needed to be solicited to move to Fusilev.  Exhibit 9 is an example of a Fusilev sales tracking spreadsheet.

**B.     The Regimen Profiler**

95.     The Regimen Profiler is another business-management tool introduced in 2006 that McKesson provides free of charge to oncology practices that agree to purchase a substantial majority of their specialty drugs through McKesson.

96.     The Regimen Profiler is similar to the Margin Analyzer in that both analyze a physician practice's drug-purchasing and reimbursement trends, and both are intended to assist a practice in maximizing revenue.  However, while the Margin Analyzer evaluates profitability at the drug level, the web-based Regimen Profiler

analyzes costs and reimbursements at the treatment-regimen level, which includes both drug and non-drug costs.  In addition, the Regimen Profiler generates customized financial-responsibility reports that enable physicians to talk to patients about their out-of-pocket costs of care.

97.    Non-drug costs are a critical part of the cost of administering oncology drugs because intravenous cancer treatments often require significant time and resources. A health care professional, for example, may have to monitor a patient receiving infusion therapy for several hours because the treatment entails significant risks.  In addition, drugs used in treatment regimens can require specialized preparation, dosage, and disposal.  In recognition of that, Medicare and other payers typically reimburse practices for the costs of administering oncology drugs over and above what they pay for the drugs themselves.

98.    The Regimen Profiler is valuable because it enables a practice to examine the financial impact of an entire treatment regimen and, like the Margin Analyzer, to compare alternative regimens to identify the one that will earn the practice the most money.

99.    The Regimen Profiler comprehensively models the practice-specific costs and reimbursements associated with a given regimen.  On the expense side, it accounts for the practice's drug-acquisition costs, as well as overhead related to drug administration, such as staff payroll and supply costs.  The tool is customizable at the patient level, enabling a practice to adjust the number of treatment cycles, cycle length, drug dosing, and other variable inputs that determine a regimen's overall costs.  And on the reimbursement side, the Regimen Profiler incorporates the payments received from Medicare and commercial insurers for administration, lab tests, and evaluation-and-management services.

100.    Like the Margin Analyzer, the Regimen Profiler generates an analysis—called the "Treatment Cost & Reimbursement Analysis Report"—that enables practices

to "forecast the impact of utilizing different yet clinically equivalent regimens." Ex. 7 (McKesson Sell Sheet entitled "Regimen Profiler: Valuable Insight for You and Your Patients"). Indeed, McKesson designed the Regimen Profiler to be used in conjunction with the Margin Analyzer to

> help practices better understand their overall profitability by factoring in both drug and non-drug costs. For example, while Margin Analyzer trending reports may show that drug X is losing money for the practice, the associated non-drug revenue that can be calculated from Regimen Profiler may balance out the loss of the drug itself, for a net positive gain.

Ex. 3.

101.    Like the Margin Analyzer, the Regimen Profiler provides significant value to oncology practices. And McKesson deploys it in the same manner as the Margin Analyzer—to win new customers and to maintain the business of existing customers. In spite of the significant value of the Regimen Profiler's analysis—for which a physician practice might otherwise pay a practice-management consultant—McKesson charges nothing for it. Rather, McKesson offers it as an inducement for actual or potential clients to commit to purchasing a substantial majority of their specialty drugs from McKesson. For instance, many of the physician practices identified in Paragraph 53, including Summit Cancer Care, Premier Oncology Center, Florida Medical Clinic, Emerald Coast Cancer Center, and Southern Hematology and Oncology, were offered the Regimen Profiler as an inducement to make a purchase commitment from McKesson, subsequently signed purchase commitments, and used the Regimen Profiler. In addition, in exchange for their loyalty commitments, McKesson made an explicit contractual promise to every Onmark Select, Prime, and MVP enrollee that McKesson would provide them access to the Regimen Profiler upon request. Like the Margin Analyzer, McKesson's provision of the Regimen Profiler to its "open market" customers free of charge violates the AKS. All claims submitted by those customers to Medicare, other federal health care programs, or

any State-funded health care program following receipt of the Regimen Profiler are false under the FCA.

**C.**   **McKesson Acknowledges Its Business-Management Tools Have Significant Value**

102.   Whether used in Quarterly Business Review meetings or to promote sales of a profitable, new drug (or a newly profitable drug), McKesson openly acknowledges the significant value the Margin Analyzer and the Regimen Profiler have to physician practices.  For example, McKesson tells practices that the "detailed view" of their "current drug purchasing and reimbursement trends" the Margin Analyzer provides is "valuable information for optimizing revenue opportunities."  Ex. 2.

103.   McKesson trains its sales representatives to communicate the Margin Analyzer's value to physician practices.  For example, McKesson developed a list of questions to help sales representatives start conversations with physician practices about the Margin Analyzer.  McKesson's internal sales literature instructs:

> While customers could ask you about Margin Analyzer, thought-provoking questions to explore their pain points and needs include:
>
> - How do you currently analyze drug margins for specific payers?
>
> - Do you have any processes in place that allow you to review your drug margins when [Medicare] ASP changes, drugs go generic or payers change reimbursement?
>
> - Do you have a process in place to maximize your economics for your supportive care medications?
>
> - Do you know which small selection of drugs is responsible for most of your drug spend, as well as for your drug margins?

Ex. 3.  The Margin Analyzer, McKesson makes clear, supplies the answer to each question.

104.    Moreover, McKesson trains its sales representatives to explain how each feature of the Margin Analyzer benefits an oncology practice.  McKesson's sales materials summarize the Margin Analyzer's features and benefits in this way:

| Features | Benefits |
|---|---|
| Captures practice specific cost and reimbursement at J code level | Difficult for practice to track as constantly changing |
| Reimbursement broken down by payer | Monitor the contribution each payer makes to the practice economics |
| Calculates top drugs by spend | Demonstrates which drugs most affect budget |
| Calculates top drugs by margin contribution | Demonstrates which drugs most affect practice profitability |
| Therapeutic Interchange Calculator (TIC) for supportive therapies | Demonstrates the current trends and forecasts options for improved economics via therapeutic interchange of supportive medic[ations] |
| Captures current and preceding quarter's data | Provides trending of both drug cost and reimbursement |
| Pharmacist support | Provides clinical guidance to the economic discussion |

Ex. 3.

105.    The Margin Analyzer and the Regimen Profiler have such significant value for physician practices that other McKesson divisions outside of the "open market" division actually do earn revenue by selling them to physician practices.  The U.S. Oncology Network, an independent business that McKesson acquired in late 2010, had a distinct business model from McKesson's "open market" division, whose practices are at issue in this case.  Whereas the "open market" division operates as a traditional drug wholesaler and distributor that purchases drugs from a manufacturer and sells them to physician practices at a marked-up rate, USON collects from its affiliated physician practices a management fee set as a percentage of either a practice's revenues or earnings.  In exchange for that fee, USON provides those practices a variety of tools and

services, which include the Margin Analyzer and the Regimen Profiler.  The "open market" division, in contrast, refuses to sell the Margin Analyzer or the Regimen Profiler directly to physician practices, instead making it available only to practices that commit to buy the substantial majority of their drugs from McKesson.  This illegal inducement violates the AKS and means that all claims for government reimbursement submitted by those physician practices are tainted by the AKS violation and thus violate the FCA.

106.    As valuable as the Margin Analyzer and the Regimen Profiler are to physician practices, they are just as central to McKesson's financial health.  As the company's leadership stated in an April 2014 PowerPoint presentation, "value-added services" like the Margin Analyzer are critical to achieving MSH's operational priority of "creat[ing] stickiness"—or fostering loyalty—with existing customers.  Ex. 8 (McKesson PowerPoint presentation entitled "U.S. Pharma/McKesson Specialty Health South Region Meeting, April 15, 2014").  During the relevant time period, McKesson also emphasized that it alone among its competitors offered services like the Margin Analyzer and the Regimen Profiler, which were a central part of its distinct "competitive advantage" in the market.

107.    Indeed, the Margin Analyzer was the centerpiece of McKesson's marketing campaign to its customers.  At sales meetings, senior McKesson officials emphasized the importance of the Margin Analyzer and the Regimen Profiler to the company's overall sales pitch.  For example, McKesson held a four-day training session in 2013 attended by the eight BDEs (salespeople responsible for acquiring and servicing new customers) representing each of the four sales regions in the United States.  Also in attendance were the Regional Vice Presidents, the National Sales Vice President, and other executives.  During this training session, which was conducted by an outside consultant, the BDEs worked to perfect their pitch to new customers.  After several days of workshops, McKesson instructed BDEs to organize their pitch around McKesson's ability to enhance the profitability of its customers.  According to the sales pitches

FIRST AMENDED COMPLAINT

resulting from that training session and follow-up meetings, the primary tool that McKesson representatives were to promote in their sales pitches to emphasize that theme was the Margin Analyzer.  It was deemed the single most important, and most valuable, tool for McKesson to win new business and to maintain its existing customers.  In follow-up development and training sessions, McKesson's sales personnel continually refined their sales pitches to emphasize the Margin Analyzer and the Regimen Profiler.  This sales pitch was so central to McKesson's business that McKesson fired one BDE because he was not sufficiently emphasizing the Margin Analyzer and the Regimen Profiler in his sales pitches.

108.    Using the Margin Analyzer and the Regimen Profiler as key inducement in the sales process was also discussed annually at national sales meetings as well as on quarterly conference calls attended by all BDEs, Regional Vice Presidents, the National Sales Vice President, the President of the "open market division," and other senior McKesson executives.  At these meetings and quarterly sales calls, McKesson routinely discussed that the Margin Analyzer and the Regimen Profiler were critical sales tools, and resulted in significant purchasing commitments.  This was also documented in written material used for these calls and meetings.

109.    Similarly, McKesson prepared a "customer testimonial video" that McKesson invited viewers to watch "to learn how Regimen Profiler [and] Margin Analyzer . . . have helped practices with clinical decision making, therapy management and financial analysis."  The video offers statements from multiple McKesson customers about the value of McKesson's business-management tools, including the following:

- Sally Binder, Director of Operations at UCLA Community Oncology Practices:  "[McKesson's] not just a place where we buy drugs from, that you guys offer a whole lot more. . . . You offer tools that we can look at our business and apply that.  There's the Regimen Profiler where I can compare two regimens side by side and look at what's the most cost

effective. . . . [McKesson offers] a lot of great tools . . . that you can use both from the clinical side as well as the business side."

- Dr. Seema Harichand Herdt, Comprehensive Cancer Center at Florida Hospital Memorial Medical Center: "Our practice is small. We are only three physicians and we practice, really, the way that I like to practice, which has been tremendous. I don't see 35 patients a day. And yet I am profitable. And that I think rests entirely on the shoulders of the Regimen Profiler and the Margin Analyzer because we weren't doing as well before we started utilizing those tools."

- Dr. Harsha Vyas, Dublin Hematology & Oncology Care: McKesson's business-management tools allow his practice to understand when "a particular drug or something we're doing is actually causing serious financial harm to us, [that] it could be done a different way. You want to realize it sooner rather than later."

- Denise Hayes, Chief Operating Officer, Redwood Regional Medical Group: "I would definitely, you know, talk to them about Regimen Profiler [and] Margin Analyzer. . . . You know, there is a tool within, within the system that is the Therapeutic Interchange and so they're looking at all the supportive therapies, and they can see, you know, which one is more cost effective. That's pretty powerful to be able to give them information that says, 'Oh, this is how much we're spending on this and maybe I should look at making another decision when all things are equal.' That kind of information is powerful for a physician[.]"

- Lynn Sawyer, Practice Administrator, Hematology & Oncology Consultants: "Many of us forget that [drug distribution is] what McKesson does for us." But the "partnership . . . goes beyond [that]. It's

FIRST AMENDED COMPLAINT

all about the team. It's all about the efficiencies in the office, to keep our

doors open, to keep us alive."

110. As these customer testimonials demonstrate, McKesson knows the

Regimen Profiler and the Margin Analyzer have significant independent value. Because

they have significant independent value to physician practices that purchase drugs from

McKesson, and eliminate an expense those physician practices would have otherwise

incurred, they are inducements prohibited by the AKS. In spite of that, McKesson

provides these tools free of charge to customers that commit to buy a substantial majority

of their specialty drugs from McKesson rather than from its competitors. These tools are

kickbacks to induce physician practices to purchase drugs from McKesson rather than its

competitors, in violation of the federal AKS and similar State laws.

**D.      McKesson Knows That These Kickbacks Result in the Submission of
False Claims to Federal and State Health-Insurance Programs**

111. McKesson knows that it is prohibited from providing anything of value to

induce physician practices to purchase anything from it. Its standard contracts include

language stating that any price discounts or reductions must be reflected and invoices

must meet the discount safe harbor set forth at 42 C.F.R. § 1001.952(h)—unless they

meet that safe harbor, the discounts would constitute an illegal kickback in violation of

the AKS. Moreover, the annual reports McKesson files with the United States Securities

and Exchange Commission acknowledge that McKesson is subject to federal and State

laws and regulations that prohibit it from offering or paying any remuneration to induce

the ordering or purchasing of items or services that Medicare, Medicaid, and other

government-sponsored health care programs pay for in any way. As this demonstrates,

McKesson was aware that it was unlawful to offer "things of value" as inducements to

customers.

112. McKesson's employee Code of Conduct likewise reflects a clear

understanding of the AKS: "there are many laws intended to protect against fraud, waste,

and abuse in healthcare. We comply with these laws by not offering things of value . . . which may improperly influence the decisions of Healthcare Professionals." It goes on to explain that "[t]he term **Healthcare Professional** includes not only licensed healthcare providers, but also other customers or potential customers who are in a position to make decision regarding the purchase of McKesson Products or services." The Code of Conduct further touts McKesson's "special role in maintain the integrity of healthcare delivery to government customers."

113.   But while McKesson says one thing in its Code of Conduct, it routinely flouts these known prohibitions in practice. McKesson is plainly aware that the federal government pays 80% of Medicare Part B costs, and it pulls reimbursement data each quarter from CMS. Yet McKesson then advises its customers how to maximize their profits, which in many cases, as set forth above, will dramatically increase the costs to the federal government. Its internal communications reflect a keen awareness that the Margin Analyzer and the Regimen Profiler are tools intended to influence the purchasing decision of health care providers—indeed, its internal communications highlight the number of business wins (new customers or extending existing customers) that are based on providing these valuable services for free. Its executives were aware of the central importance of the Margin Analyzer and the Regimen Profiler in McKesson's marketing campaigns, and encouraged BDEs to rely on those tools to generate business.

E.   **McKesson Uses Valuable Inducements to Knowingly Cause the Submission of False Claims to Federal and State Health-Insurance Programs**

114.   McKesson has provided oncology practices the business-management tools described above more than a thousand times in the years since the company developed them. Scores of oncology practices have been offered these free "value added services." McKesson instructed its sales representatives to provide these valuable tools to practices that are McKesson's current and prospective customers to induce them to purchase pharmaceutical drugs (or to continue purchasing pharmaceutical drugs) from

McKesson.  McKesson maintains records of these physician practices' names, and Relator does not presently have access to comprehensive lists of the McKesson customers who received McKesson's business-management tools.  But Relator participated in quarterly and annual sales meetings and conference calls with his colleagues, during which these instructions were provided to the BDEs covering all of the regions of the country.

115.    In every instance, McKesson provided the Margin Analyzer and the Regimen Profiler free of charge to oncology practices that committed to buy specialty drugs from it.  In exchange for these valuable, free tools, McKesson requested that physician practices purchase drugs from the company.

116.    Giving away valuable business-management tools at no cost induced scores of physician practices to buy drugs from McKesson rather than its competitors.  It induced many of those practices, including those set out in Paragraph 53 and scores of other practices,  to purchase the highest-margin drugs among therapeutically interchangeable alternatives, which were often the most expensive drugs, or far more expensive than other therapeutically interchangeable drugs.  The inducements produced a financial windfall for McKesson and its customers, but resulted in economic harm to payers, patients, and McKesson's competitors.  It also violated the AKS.

117.    McKesson knowingly and willfully offered and provided these valuable business-management tools to oncology practices at no cost to induce them to buy drugs from McKesson.  Practices that received McKesson's illegal inducements submitted claims for reimbursement for drugs they prescribed to patients in federal and State-funded health care programs in violation of the federal AKS and similar State anti-kickback laws.

118.    When McKesson intentionally decided to employ these illegal kickbacks to promote its drugs, it knew that physician practices were filing and would continue to routinely and necessarily file false and fraudulent claims with the federal government and

State governments when seeking federal and State reimbursement for its pharmaceutical products. For instance, for potential customers that McKesson pitched business, it was standard practice for those physician practices to provide their specific payer mix information, including Medicare payment information, to McKesson so that McKesson could populate the Margin Analyzer and demonstrate the utility of this product during the sales process. This was true for each of the practices identified in Paragraph 53. Once those practices signed purchase commitments with McKesson, McKesson continued to populate the Margin Analyzer with payer mix information that revealed Medicare reimbursement for the drugs the physician practices purchased from McKesson pursuant the purchase commitments.

119. Indeed, the calculation of customer profits based on Medicare reimbursement rates for different drugs itself demonstrates McKesson's knowledge that those customers would submit claims for reimbursement from government health care programs. Likewise, the provision of "cheat sheets" indicating which drugs would be the most profitable to bill to Medicare demonstrate McKesson's knowledge that those customers would submit claims for reimbursement from government health care programs.

120. Medicare and Medicaid claims for the payment of McKesson's specialty drugs induced by illegal kickbacks are submitted to the United States and the States by oncology practices that fill patient prescriptions and administer the drugs. Because drug prescriptions induced by illegal kickbacks are not eligible for federal or State reimbursement, the submission of reimbursement claims for such prescriptions is a false or fraudulent claim under the federal FCA and analogous State false-claims statutes.

121. During the period between 2012 and November 30, 2017, McKesson's "open market" customers who had received the Margin Analyzer and/or the Regimen Profiler free of charge submitted hundreds of millions of dollars in claims for reimbursement to Medicare alone. These included claims submitted by each of the

practices identified in Paragraph 53, and scores of others.  Although Relator does not possess sufficient records to calculate the analogous claim figures, McKesson customers that received these illegal kickbacks also submitted claims for payment by the federal government associated with TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program, as well as to State-funded health care programs.

122.    McKesson's "open market" customers who received the Margin Analyzer and/or the Regimen Profiler free of charge were located across the country.   Although Relator does not possess comprehensive records pertaining to all of McKesson's "open market customers," customers in California, Florida, Georgia, Hawaii, Michigan, New Mexico, New York, and Texas, and, on information and belief, in Colorado, Connecticut, Delaware, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, North Carolina, Oklahoma, Rhode Island, Tennessee, Virginia, Washington, the District of Columbia, and numerous other States, received the Margin Analyzer and/or the Regimen Profiler free of charge.  On information and belief, customers in the above States that received these illegal kickbacks submitted claims to their respective State's State-funded health care programs.

123.    Each prescription written as a result of McKesson's illegal inducements is a false or fraudulent record or statement.  Each claim for reimbursement for illegally induced prescriptions submitted to a federal health insurance program is a false or fraudulent claim for payment.  The submission of these false claims was not only foreseeable, but an intended result of McKesson's illegal kickbacks.  Because McKesson knowingly caused the creation of false records and statements, and knowingly caused false or fraudulent claims to be filed due to its illegal kickback practices, it is liable under the federal FCA and analogous State laws.

## VIII.   CAUSES OF ACTION

### Count I

### False Claims Act

### 31 U.S.C. § 3729(a)(1)(A)–(B)

124.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

125.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

126.    Defendants knowingly have caused to be presented, false or fraudulent claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

127.    Defendants knowingly have caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

128.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the United States presented the false claims.  Relator has no control over such entities and no access to records they possess.

129.    The United States government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

130.    Defendants have damaged, and continue to damage, the United States in a substantial amount to be determined at trial.

131.    Additionally, the United States is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count II

## California False Claims Law

## Cal. Gov't Code § 12651(a)(1)–(2)

132.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

133.     This is a claim for treble damages and penalties under the California False Claims Law.

134.     Defendant knowingly caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

135.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

136.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

137.     The California State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

138.     Defendants have damaged, and continue to damage, the State of California in a substantial amount to be determined at trial.

139.     Additionally, the California State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count III

## Colorado Medicaid False Claims Act

## Colo. Rev. Stat. § 25.5-4-305(1)(a)–(b)

140.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

141.    This is a claim for treble damages and penalties under the Colorado Medicaid False Claims Act.

142.    Defendant knowingly caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

143.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

144.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

145.    The Colorado State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

146.    Defendants have damaged, and continue to damage, the State of Colorado in a substantial amount to be determined at trial.

147.    Additionally, the Colorado State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count IV

## Connecticut False Claims Act

## Conn. Gen. Stat. § 4-275(a)(1)–(2)

148.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

149.     This is a claim for treble damages and penalties under the Connecticut False Claims Act.

150.     Defendant knowingly caused to be presented, false or fraudulent claims to the Connecticut State Government for payment or approval.

151.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Connecticut State Government to approve and pay such false and fraudulent claims.

152.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

153.     The Connecticut State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

154.     Defendants have damaged, and continue to damage, the State of Connecticut in a substantial amount to be determined at trial.

155.     Additionally, the Connecticut State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count V

## Delaware False Claims and Reporting Act

## Del. Code Ann. tit. 6, § 1201(a)(1)–(2)

156.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

157.    This is a claim for treble damages and penalties under the Delaware False Claims and Reporting Act.

158.    Defendant knowingly caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

159.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

160.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

161.    The Delaware State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

162.    Defendants have damaged, and continue to damage, the State of Delaware in a substantial amount to be determined at trial.

163.    Additionally, the Delaware State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count VI

## Florida False Claims Act

## Fla. Stat. Ann. § 68.082(2)(a)–(b)

164.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

165.    This is a claim for treble damages and penalties under the Florida False Claims Act.

166.    Defendant knowingly caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

167.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

168.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

169.    The Florida State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

170.    Defendants have damaged, and continue to damage, the State of Florida in a substantial amount to be determined at trial.

171.    Additionally, the Florida State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

**Count VII**

**Georgia State False Medicaid Claims Act**

**Ga. Code Ann. § 49-4-168.1(a)(1)–(2)**

172.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

173.     This is a claim for treble damages and penalties under the Georgia State False Medicaid Claims Act.

174.     Defendant knowingly caused to be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

175.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

176.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

177.     The Georgia State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

178.     Defendants have damaged, and continue to damage, the State of Georgia in a substantial amount to be determined at trial.

179.     Additionally, the Georgia State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count VIII

## Hawaii False Claims Act

## Haw. Rev. Stat. § 661-21(a)(1)–(2)

180.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

181.     This is a claim for treble damages and penalties under the Hawaii False Claims Act.

182.     Defendant knowingly caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

183.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

184.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

185.     The Hawaii State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

186.     Defendants have damaged, and continue to damage, the State of Hawaii in a substantial amount to be determined at trial.

187.     Additionally, the Hawaii State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count IX

## Illinois False Claims Act

## 740 Ill. Comp. Stat. 175/3(a)(1)(A)–(B)

188.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

189.     This is a claim for treble damages and penalties under the Illinois False Claims Act.

190.     Defendant knowingly caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

191.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

192.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

193.     The Illinois State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

194.     Defendants have damaged, and continue to damage, the State of Illinois in a substantial amount to be determined at trial.

195.     Additionally, the Illinois State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**Count X**

**Indiana False Claims and Whistleblower Protection Act**

**Ind. Code Ann. § 5-11-5.5-2(b)(1)–(2)**

196.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

197.     This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

198.     Defendant knowingly caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

199.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

200.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

201.     The Indiana State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

202.     Defendants have damaged, and continue to damage, the State of Indiana in a substantial amount to be determined at trial.

203.     Additionally, the Indiana State Government is entitled to the maximum penalty for each and every violation alleged herein.

## Count XI

## Iowa False Claims Act

## Iowa Code § 685.2(1)(a)–(b)

204.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

205.    This is a claim for treble damages and penalties under the Iowa False Claims Act.

206.    Defendant knowingly caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

207.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

208.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

209.    The Iowa State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

210.    Defendants have damaged, and continue to damage, the State of Iowa in a substantial amount to be determined at trial.

211.    Additionally, the Iowa State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count XII

## Louisiana Medical Assistance Programs Integrity Law

## La. Rev. Stat. § 46:438.3(A)–(B)

212.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

213.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

214.    Defendant knowingly caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

215.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

216.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

217.    The Louisiana State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

218.    Defendants have damaged, and continue to damage, the State of Louisiana in a substantial amount to be determined at trial.

219.    Additionally, the Louisiana State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

### Count XIII

### Massachusetts False Claims Law

### Mass. Gen. Laws ch. 12, § 5B(a)(1)–(2)

220.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

221.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

222.    Defendant knowingly caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

223.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

224.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

225.    The Massachusetts State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

226.    Defendants have damaged, and continue to damage, the State of Massachusetts in a substantial amount to be determined at trial.

227.    Additionally, the Massachusetts State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

FIRST AMENDED COMPLAINT

## Count XIV

## Michigan Medicaid False Claims Act

## Mich. Comp. Laws § 400.603(1)–(2)

228.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

229.     This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

230.     Defendant knowingly caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

231.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

232.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

233.     The Michigan State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

234.     Defendants have damaged, and continue to damage, the State of Michigan in a substantial amount to be determined at trial.

235.     Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## Count XV

## Minnesota False Claims Act

## Minn. Stat. § 15C.02(a)(1)–(2)

236.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

237.    This is a claim for treble damages and penalties under the Minnesota False Claims Act.

238.    Defendant knowingly caused to be presented, false or fraudulent claims to the Minnesota State Government for payment or approval.

239.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Minnesota State Government to approve and pay such false and fraudulent claims.

240.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

241.    The Minnesota State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

242.    Defendants have damaged, and continue to damage, the State of Minnesota in a substantial amount to be determined at trial.

243.    Additionally, the Minnesota State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count XVI

## Montana False Claims Act

## Mont. Code Ann. § 17-8-403(1)(a)–(b)

244.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

245.     This is a claim for treble damages and penalties under the Montana False Claims Act.

246.     Defendant knowingly caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

247.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

248.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

249.     The Montana State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

250.     Defendants have damaged, and continue to damage, the State of Montana in a substantial amount to be determined at trial.

251.     Additionally, the Montana State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**Count XVII**

**Nevada False Claims Act**

**Nev. Rev. Stat. Ann. § 357.040(1)(a)–(b)**

252.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

253.    This is a claim for treble damages and penalties under the Nevada False Claims Act.

254.    Defendant knowingly caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

255.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

256.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

257.    The Nevada State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

258.    Defendants have damaged, and continue to damage, the State of Nevada in a substantial amount to be determined at trial.

259.    Additionally, the Nevada State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count XVIII

## New Hampshire False Claims Act

## N.H. Rev. Stat. Ann. § 167:61-b(I)(a)–(b)

260.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

261.    This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

262.    Defendant knowingly caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

263.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

264.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

265.    The New Hampshire State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

266.    Defendants have damaged, and continue to damage, the State of New Hampshire in a substantial amount to be determined at trial.

267.    Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

FIRST AMENDED COMPLAINT

<u>**Count XIX**</u>

<u>**New Jersey False Claims Act**</u>

<u>**N.J. Stat. Ann. § 2A:32C-3(a)–(b)**</u>

268.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

269.     This is a claim for treble damages and penalties under the New Jersey False Claims Act.

270.     Defendant knowingly caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

271.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

272.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

273.     The New Jersey State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

274.     Defendants have damaged, and continue to damage, the State of New Jersey in a substantial amount to be determined at trial.

275.     Additionally, the New Jersey State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**Count XX**

**New Mexico Medicaid False Claims Act**

**N.M. Stat. Ann. § 27-14-4(A), (C)**

276.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

277.     This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

278.     Defendant knowingly caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

279.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

280.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

281.     The New Mexico State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

282.     Defendants have damaged, and continue to damage, the State of New Mexico in a substantial amount to be determined at trial.

283.     Additionally, the New Mexico State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

FIRST AMENDED COMPLAINT

## Count XXI

## New York False Claims Act

## N.Y. State Fin. Law § 189(1)(a)–(b)

284.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

285.    This is a claim for treble damages and penalties under the New York False Claims Act.

286.    Defendant knowingly caused to be presented, false or fraudulent claims to the New York State Government for payment or approval.

287.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the New York State Government to approve and pay such false and fraudulent claims.

288.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

289.    The New York State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

290.    Defendants have damaged, and continue to damage, the State of New York in a substantial amount to be determined at trial.

291.    Additionally, the New York State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count XXII

## North Carolina False Claims Act

## N.C. Gen. Stat. § 1-607(a)(1)–(2)

292.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

293.     This is a claim for treble damages and penalties under the North Carolina False Claims Act.

294.     Defendant knowingly caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

295.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

296.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

297.     The North Carolina State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

298.     Defendants have damaged, and continue to damage, the State of North Carolina in a substantial amount to be determined at trial.

299.     Additionally, the North Carolina State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

FIRST AMENDED COMPLAINT

### Count XXIII

### Oklahoma Medicaid False Claims Act

### Okla. Stat. tit. 63, § 5053.1(B)(1)–(2)

300.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

301.     This is a claim for treble damages and penalties under the Oklahoma Medicaid False Claims Act.

302.     Defendant knowingly caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

303.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

304.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

305.     The Oklahoma State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

306.     Defendants have damaged, and continue to damage, the State of Oklahoma in a substantial amount to be determined at trial.

307.     Additionally, the Oklahoma State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

FIRST AMENDED COMPLAINT

## Count XXIV

## Rhode Island False Claims Act

## 9 R.I. Gen. Laws § 9-1.1-3(a)(1)–(2)

308.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

309.    This is a claim for treble damages and penalties under the Rhode Island False Claims Act.

310.    Defendant knowingly caused to be presented, false or fraudulent claims to the Rhode Island State Government for payment or approval.

311.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Rhode Island State Government to approve and pay such false and fraudulent claims.

312.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

313.    The Rhode Island State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

314.    Defendants have damaged, and continue to damage, the State of Rhode Island in a substantial amount to be determined at trial.

315.    Additionally, the Rhode Island State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

<u>**Count XXV**</u>

<u>**Tennessee False Claims Act and Tennessee Medicaid False Claims Act**</u>

<u>**Tenn. Code Ann. § 4-18-103(a)(1)–(2) and § 71-5-182(a)(1)(A)–(B)**</u>

316.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

317.    This is a claim for treble damages and penalties under Tennessee False Claims Act and Tennessee Medicaid False Claims Act.

318.    Defendant knowingly caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

319.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

320.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

321.    The Tennessee State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

322.    Defendants have damaged, and continue to damage, the State of Tennessee in a substantial amount to be determined at trial.

323.    Additionally, the Tennessee State Government is entitled to the maximum penalties pursuant to the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act for each and every violation alleged herein.

## Count XXVI

## Texas Medicaid Fraud Prevention Law

## Tex. Hum. Res. Code Ann. § 36.002

324.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

325.     This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

326.     Defendant knowingly caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

327.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

328.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

329.     The Texas State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

330.     Defendants have damaged, and continue to damage, the State of Texas in a substantial amount to be determined at trial.

331.     Additionally, the Texas State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

## Count XXVII

## Virginia Fraud Against Taxpayers Act

## Va. Code Ann. § 8.01-216.3(A)(1)–(2)

332.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

333.     This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

334.     Defendant knowingly caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

335.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

336.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

337.     The Virginia State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

338.     Defendants have damaged, and continue to damage, the State of Virginia in a substantial amount to be determined at trial.

339.     Additionally, the Virginia State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**Count XXVIII**

**Washington State Medicaid Fraud False Claims Act**

**Wash. Rev. Code § 74.66.020(1)(a)–(b)**

340.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

341.    This is a claim for treble damages and penalties under the Washington State Medicaid Fraud False Claims Act.

342.    Defendant knowingly caused to be presented, false or fraudulent claims to the Washington State Government for payment or approval.

343.    Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the Washington State Government to approve and pay such false and fraudulent claims.

344.    Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the State presented the false claims.  Relator has no control over such entities and no access to records they possess.

345.    The Washington State Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

346.    Defendants have damaged, and continue to damage, the State of Washington in a substantial amount to be determined at trial.

347.    Additionally, the Washington State Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**Count XXIX**

**District of Columbia False Claims Act**

**D.C. Code § 2-381.02(a)(1)–(2)**

348.     Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 123 above as though fully set forth herein.

349.     This is a claim for treble damages and penalties under the District of Columbia False Claims Act.

350.     Defendant knowingly caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

351.     Defendant knowingly caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

352.     Relator cannot now identify all of the false claims for payment that Defendants' conduct caused, as numerous separate entities across the District of Columbia presented the false claims.  Relator has no control over such entities and no access to records they possess.

353.     The District of Columbia Government, unaware of the falsity of the records, statements, and claims that Defendants made or caused to be made, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

354.     Defendants have damaged, and continue to damage, the District of Columbia in a substantial amount to be determined at trial.

355.     Additionally, the District of Columbia Government is entitled to the maximum penalty of up to $23,331 for each and every violation alleged herein.

**IX.     PRAYER**

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.     That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*, and the analogous State statutes set forth above;

2.      That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States and the States have sustained because of Defendants' actions, plus the maximum civil penalty permitted for each violation of the Federal False Claims Act or of the analogous State statutes;

3.      That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and the equivalent provisions of the State statutes set forth above;

4.      That Realtor be awarded all fees, costs, and expenses incurred in connection with this action, including attorneys' fees, costs, and expenses; and

5.      That Relator recover such other relief as the Court deems just and proper.

## X.      **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

FIRST AMENDED COMPLAINT

Dated:  June 3, 2020

Respectfully submitted,

STEPHEN S. HASEGAWA*
 shasegawa@pcsf.com
 *Admitted Pro Hac Vice
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel:  (415) 836-9000
Fax:  (415) 836-9001


ANDREW C. SHEN
 ashen@kellogghansen.com
JAMES M. WEBSTER (pro hac application
forthcoming)
 jwebster@kellogghansen.com
DAVID L. SCHWARZ (pro hac application
forthcoming)
 dschwarz@kellogghansen.com
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999


RISHI BHANDARI
 rb@mandelbhandari.com
MANDEL BHANDARI LLP
80 Pine Street, 33rd Floor
New York, NY 10005
Tel:  (212) 269-5600
Fax: (646) 964-6667


ARI YAMPOLSKY (pro hac application
forthcoming)
 ayampolsky@constantinecannon.com
CONSTANTINE CANNON LLP
150 California Street, Suite 1600
San Francisco, CA 94111
Tel. (415) 639-4001


Attorneys for Qui Tam Plaintiff Adam Hart

FIRST AMENDED COMPLAINT