L5DGUNIC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA, et
    al.,
4
                    Plaintiffs,
5
            v.                          15 Civ. 903 (JLC)
6
    MCKESSON CORPORATION, et al.,
7                                       Telephone Conference

8                   Defendants.

9   ------------------------------x
                                        New York, N.Y.
10                                      May 13, 2021
                                        2:30 p.m.
11
    Before:
12
                        HON. JAMES L. COTT,
13
                                        Magistrate  Judge
14
                            APPEARANCES
15
    KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC
16          Attorneys for Plaintiffs
    BY:  BRADLEY E. OPPENHEIMER
17          ANDREW CHUN-YANG SHEN

18  COVINGTON & BURLING LLP
            Attorneys for Defendants
19  BY:  ETHAN POSNER
            KRYSTEN MOLLER
20          MORGAN SAUNDERS
            SHAILEE SHARMA
21          NICHOLAS PASTAN

22

23

24

25

L5DGUNIC

1             (The Court and all parties present remotely)

2             THE DEPUTY CLERK:  USA v. McKesson Corp.

3             Will plaintiffs counsel please state your name for the

4      record.

5             MR. OPPENHEIMER:  Good afternoon, your Honor.  Bradley

6      Oppenheimer from Kellogg Hansen.  I'm joined by Andy Shen from

7      my firm.  And I'll be speaking on behalf of the relator today.

8             THE COURT:  Good afternoon to you, Mr. Oppenheimer and

9      Mr. Shen.

10            THE DEPUTY CLERK:  And for the defendants?

11            MR. POSNER:  Good afternoon, your Honor.  It's Ethan

12     Posner from Covington and Burling.  I have several of my

13     colleagues on from Covington.  They can introduce themselves.

14            THE COURT:  Do you want them identified for the

15     record?

16            MR. POSNER:  Yes, I do.

17            MS. MOLLER:  Hi, it's Krysten Moller.  And we also

18     have Morgan Saunders and Shailee Sharma from Covington.

19            THE COURT:  Good afternoon to all of you.

20            MR. PASTAN:  This is Nicholas Pastan also from

21     Covington, your Honor.

22            THE COURT:  Good afternoon.

23            Why don't we start, if we can, with the proposed phase

24     one discovery schedule that is identified in Docket No. 87, the

25     letter to the Court dated May 6th.  And I guess, for lack of a

L5DGUNIC

1    better way of proceeding, we'll just go one item at a time.  I

2    guess I'll say at the outset that it's frankly somewhat

3    concerning that the parties seem to fight about virtually

4    everything in this case that's at least brought to the Court's

5    attention.  Discovery under the federal rules is not intended

6    to require extensive judicial supervision.  And I have real

7    concerns about that in this case.  The first item on the list

8    is a great example.  It identifies the completion of

9    production.  And the relator wants July 30th and the defendant

10   wants September 30th, so let's hear why there is a difference

11   on that subject.

12            Mr. Oppenheimer?

13            MR. OPPENHEIMER:  I think there are two issues here.

14   One is the date itself, but the other is implicitly, I think,

15   whether there's going to be an opportunity for further requests

16   for production.  The relator's proposal is that there be

17   further opportunities beyond the first production, as discovery

18   ordinarily works under the federal rules.  We don't see any

19   reason why it should be cut off before we have even seen the

20   first production of documents from the other side, our ability

21   to request more.  Same thing with taking depositions and

22   receiving interrogatory responses, all of those things can lead

23   to valid additional document requests that we think we need the

24   right to be able to make.  And McKesson's proposal would

25   essentially cut off our ability to do that in advance of a

L5DGUNIC

1   single production deadline that's far before the bulk of

2   discovery outside of the paper has occurred.

3           On the dates in particular, our proposal has attempted

4   to give McKesson a substantial amount of time to make their

5   productions.  We're trying to be realistic.  McKesson has

6   represented to us that it's a very large volume of documents

7   they're dealing with and that they aren't going to be able to

8   get us a full list of proposed custodians even, they don't have

9   a schedule for that yet, but it's coming.  Given that we don't

10  even have the custodians yet, we recognize that there's going

11  to be some additional time needed.  But we served these

12  requests for production back in March, and we think that our

13  proposal that gives more than four months to respond to them

14  and produce documents is more than sufficient.  And any further

15  delay is unnecessary and prejudicial as we try to prepare for

16  depositions and the remainder of discovery.

17          THE COURT:  Well, let's back up for a minute.  I think

18  I want to understand better how we're defining the term

19  completion of productions.  What does that precisely refer to

20  in the context of this phase one discovery schedule?

21          MR. OPPENHEIMER:  Relator's proposal is that the

22  July 30th deadline is the completion of production in response

23  to the first set of requests for productions that the relator

24  already served in March, and that subsequent productions would

25  follow either the default rules, the default calendar set by

L5DGUNIC

Rule 34 and Rule 36 or that we would negotiate specific dates

on a good-faith basis, if McKesson tells us they need more time

and vice versa, if they submit requests to us and we say we

need more time.  But we think the future ones can be handled on

a case-by-case basis.  And our proposal is that this deadline

applies just to the initial request for production that we've

already served.  My understanding is that McKesson's

proposal –– and Mr. Posner can certainly correct me if I'm

getting this wrong –– but my understanding is that theirs is a

single date for all possible productions during phase one, that

essentially any requests we want to make have to be made in

time for the September 30th production.

          THE COURT:  Mr. Posner, is that correct?

          MR. POSNER:  Yes, I mean, I think we envision –– the

production here, as usual, is going to be completely

asymmetric, right.  We'll be producing, I don't know, 500 times

more than they will.  And there's thousands, tens of thousands

of documents that likely will be produced.  I think we're

envisioning phase one document production to be complete by

September 30.

          THE COURT:  Well, the relator has served a document

request on you.  When is it anticipated that you will be

responding to that?

          MR. POSNER:  Well, I mean, the answer is, in waves

from now until September 30th.  They have served 54 requests.

L5DGUNIC

```
1    Most of the documents in these cases, as your Honor knows,

2    comes from electronic custodial files and we'll be searching

3    those and other hard copy sources and other sources within the

4    company.  But we have to agree with the relator on search terms

5    and custodians, which we're in the process of doing.  And

6    that's going to likely result in the production of -- I don't

7    know the number -- but a lot of documents.  And we're going to

8    produce those documents in waves between now and

9    September 30th.  We're not going to wait and produce it all on

10   September 29th, if that was the question.

11            THE COURT:  Look, let's work backwards.  The one thing

12   that it appears of real substance that the parties did agree to

13   is probably the single most important thing, and that's the end

14   of the phase one fact discovery, and that's the end of February

15   of next year.  And that's the most important deadline.

16   Everything else sort of flows from it.  So I assume what we're

17   trying to accomplish here is to ensure that the document

18   production, however characterized and of whatever scope, has an

19   end date sufficient to allow the parties to then avail

20   themselves of the documents for purposes of taking depositions.

21   Fair statement?

22            MR. POSNER:  Yes, that's correct, your Honor.  That's

23   why we gave them, whatever, five months between when we

24   estimate completing our production and then the close of phase

25   one discovery is five months.
```

L5DGUNIC

1          THE COURT:  There's a certain amount of this that the

2    Court cannot and will not micromanage.  So you just represented

3    you're not, if the date were to be September 30th, going to

4    dump on September 29th hundreds of thousands, if not millions,

5    of pages of documents.  So you're telling the Court that

6    there's going to be rolling production of some kind in response

7    to the initial request that the relator has made; is that

8    right, Mr. Posner?

9          MR. POSNER:  That's correct, your Honor.

10          THE COURT:  Can you tell the Court when the first

11    production is going to be made in response to the request?

12          MR. POSNER:  I don't know just because we still have

13    to agree on the search terms and the custodians which really

14    drives it.  Once you agree on that, you then start producing in

15    waves.  I don't have a date for the first one.  But you

16    certainly have my representation that it will be in waves.  I

17    don't know if one of my colleagues wants to weigh in.  They may

18    be a little closer on that, but we're in the process of talking

19    about search terms and custodians.  And once you agree on that,

20    you then start rolling the productions out.

21          THE COURT:  Well, let's put a pin in the subject for a

22    minute because everything is somewhat interrelated.

23          I can't quite understand what you're disagreeing about

24    with respect to depositions.  The relator says 13 without

25    prejudice to the number of fact depositions in phase two, and

L5DGUNIC

McKesson says each party may depose up to 13 fact witnesses.

Do you mean, Mr. Posner, in that regard, 13 total for phase

one, phase two and phase 54, if there were phase 54?  I mean,

what does that mean exactly?  What's the disagreement there?

          MR. POSNER:  I'm not sure there is one, your Honor,

actually.  I guess I perceived there to be less -- I understand

your Honor's frustration -- I actually thought there was a

little less disagreement here than meets the eyes.  But I think

we're fine with 13 fact witnesses in phase one.

          THE COURT:  So if there are going to be 13 fact

witnesses for each side, so 26 depositions, but there are

multiple lawyers from both law firms involved, so

realistically, if you have an end date of February for phase

one fact discovery, the depositions realistically are probably

going to be taken in November, if you're lucky, December,

January and February; right?  Maybe January and February, given

the way lawyers work who think they can't take a deposition if

they don't have every single last document in hand before they

do, which in my experience isn't really something I think

should be true, but that's how lawyers seem to think.  But if

that's true, why should the deadline be July or September, why

shouldn't it be November 1st or something?  I think this is all

a little bit artificial and made up, frankly.  I don't quite

understand.  It's a little bit -- pardon the expression --

angel's dancing on the head of a pin.  Why does either

L5DGUNIC

1   July 30th or September 30th frankly make any sense in a case

2   where the fact discovery deadline is the end of February and

3   this is only important because you need it in the run up to

4   depositions, and realistically, depositions aren't going to

5   take place until the end of the fall anyway?  So I don't quite

6   understand the timeline that you all are contemplating.  Maybe

7   you can educate me in terms of what you're thinking in that

8   regard.

9           Mr. Oppenheimer, do you want to address that?

10          MR. OPPENHEIMER:  Sure, your Honor.  From relator's

11   perspective, again, our production deadline is referring

12   specifically to the first set of productions that we served in

13   March.  And the reason why we think that the July deadline is

14   appropriate is it gives far longer than the federal rules

15   permit by default, but it also gives us time to be able to

16   review those and figure out what further productions or

17   interrogatories or other discovery tools we may need to deploy.

18   There's a very real chance that we're going to need to issue

19   several Rule 45 subpoenas to third parties, things like that.

20   Those also take time.  And we need to make sure that we've got

21   the documents from the parties in the case, from McKesson,

22   before we go and start seeking them in substantial part from

23   nonparties, who are very likely to object that it's less

24   burdensome for us to just get them from McKesson in the first

25   place.  So having a sense of what we're going to have in hand

L5DGUNIC

1    with enough time in order to review them and finish this

2    process and still be able to take the depositions we need to

3    take is important, and that's the reason for our proposed

4    deadline of July 30th.

5             THE COURT:  Mr. Posner, is there a problem with

6    agreeing to July 30th as the deadline to respond to the

7    relator's initial production request?

8             MR. POSNER:  You mean to provide written responses or

9    all of the documents?

10            THE COURT:  The latter.

11            MR. POSNER:  Well, providing all the -- is there a

12   problem providing all the documents in response to their 54

13   requests by July 30?

14            THE COURT:  Yes, which you have had since April, so

15   that gives you April, May, June and July, so that's four

16   months, which is 90 days more than the rules allow because this

17   is a complicated case.  My question is, can the defendant make

18   its response in production by the end of July as to the first

19   request?  That's right, 54 of them, yes.  That's the question.

20            MR. POSNER:  We're still working on the search

21   terms -- I mean, your Honor, there's complex cases and then

22   there's like really big document cases, and we've done enough

23   of them to know.  Going back to your Honor's point, it seems

24   like an artificial deadline.  They're going to have the

25   documents in waves, why not just impose a November 1 deadline.

L5DGUNIC

1    They're still going to have months before the conclusion, like

2    that's fine with us.

3         THE COURT:  You're the ones who are putting this to

4    the Court.  You identified this as the very first category and

5    the very first topic for us to discuss today in this letter.  I

6    mean, as a judge, if I see one side wants July 30th and the

7    other side wants September 30th, my instinct is to say

8    August 30th, okay.  But I'm trying to get behind this to really

9    understand what it means, because you haven't really explained

10   to me entirely what it means here.  What the relator wants is a

11   date certain by which the production -- and by production, I

12   mean, yes, documents to be produced -- are in hand.  They say

13   July 30th, that's ample time.  You're playing the this is an

14   even more complex case than complex cases, so we need more

15   time, you're telling me September 30th.  But you're also

16   representing as an officer of the Court you're not going to

17   make the whole production on September 29th.

18        What I don't understand is if you all agree to

19   custodians in two weeks from now, why wouldn't the first

20   tranche of documents, at least with respect to some of these

21   custodians, be being made in early June, let's say?  I mean, I

22   don't know what the particulars are here.  I don't frankly want

23   to get in the weeds because I don't think I need to.

24        MR. POSNER:  No, I'm not asking you to get in the

25   weeds.  And we may very well make the first tranche in early

L5DGUNIC

1    June.  You're just asking me to make the next nine tranches or

2    whatever the number of tranches are -- the problem is, your

3    Honor, I don't know what the number -- it could be in the

4    millions for all I know.  We still have to agree on the search

5    terms, then you run the search term hits, and we tell the other

6    side, hey, your terms call for the production of 4 million

7    pages, why don't we work on modifying the search terms.  And I

8    don't want you to get involved in that, I'm just trying to

9    explain -- because the two sides should do that on their own

10   without bothering you about it -- I'm just trying to explain to

11   you, I don't know the number of documents that are going to be

12   required to be produced.  All I can tell you is in my

13   experience in these kinds of cases and in yours, it is likely

14   going to be very, very large.  So all I'm asking is why impose

15   an artificial deadline at the end of July on what could be

16   requiring us to produce, I don't know, a million pages.  It

17   just seems extreme, particularly when both sides agree on an

18   end of February date.

19          THE COURT:  Mr. Oppenheimer, why do we need to have a

20   date at all in this category?

21          MR. OPPENHEIMER:  Your Honor, my concern is that

22   without a date, this production is just going to continue

23   slipping and getting pushed, and it's going to prejudice our

24   ability to serve Rule 45 subpoenas, to prepare for depositions,

25   to do all of the other discovery tasks that we need to do.

L5DGUNIC

1    Mr. Posner has talked about negotiating search terms and

2    custodians.  We still haven't received a first proposal from

3    that, and they have had our requests in hand for more than six

4    weeks at this point.  My concern is, without a date, it's never

5    going to happen.

6        THE COURT:  Look, I think I've heard enough to do the

7    following, otherwise this will just go on indefinitely.  You

8    have put this to me, you have asked me to set a date for what

9    you characterize as the completion of production.  You have

10   disagreed about the date.  I have heard you.  And my decision

11   is that the date for the completion of production here will be

12   August 30th.

13       MR. OPPENHEIMER:  Your Honor, can we just clarify, is

14   that the date for the production in response to the initial

15   requests that have been served?  Our secondary concern here and

16   the other point of disagreement is whether that should be

17   essentially a cut off for the entire case, which we don't think

18   is appropriate, given that we haven't seen the first production

19   yet.

20       THE COURT:  Well, be careful with your words.  When

21   you say the "entire case," this is a schedule for phase one, so

22   it isn't the entire case.  August 30th is the date for the

23   completion of the defendants' response to your initial request

24   for production, that's what it is, August 30th.  It doesn't

25   mean that there can't be additional requests for production,

L5DGUNIC

```
1   but I don't know what that will entail.  I don't know what the

2   timeline for that will be.  And it's the kind of thing the

3   parties should meet and confer and work out without the Court

4   supervising.  There are a lot of cases where a lot of the

5   internal deadlines aren't ones that the Court sets because the

6   parties agree to them.  But you have put this to me, so it's

7   August 30th for the completion of the responses to your initial

8   request.

9              MR. OPPENHEIMER:  Thank you, your Honor.  We

10   appreciate the clarification.

11             THE COURT:  Now, I do not understand what the second

12   category means.  Maybe someone can enlighten me.  It

13   contemplates that if there are motions to compel after I order

14   something with respect to them, then you're going to work in

15   good faith to make timely production.  That needs to be

16   memorialized in some way?  I don't quite follow that.  It's an

17   agreed to condition, but you're agreeing to do what the Court

18   says?  You're agreeing to act in good faith?  What does it even

19   mean?

20             MR. OPPENHEIMER:  Your Honor, I think the only point

21   was we were not proposing a separate clock or timeline for

22   these productions if there is any in response to motions to

23   compel, if the parties will work in good faith, and obviously

24   we will follow the Court's orders.  But we don't need a

25   separate calendar for that.
```

L5DGUNIC

1          THE COURT:  I'm assuming, if you put this to me and I

2    order some production, when I do that, I'm going to order it by

3    a date certain in that particular context, so that's how that

4    presumably would be handled.

5          Now, we have a fight over whether it's 30 or 45 days

6    of completion with respect to the production of privilege logs.

7    What's the problem there?  And why couldn't you agree about

8    that?

9          MR. OPPENHEIMER:  Your Honor, this I think was an

10   outgrowth of the dispute over the completion of production

11   deadlines that we were just discussing.  Our concern had been

12   that, under defendants' proposal, we wouldn't be getting the

13   privilege logs potentially until after depositions had started.

14   I think in light of the Court's decision with the August

15   completion date, we are fine agreeing to 45 days for this item.

16         THE COURT:  It will be 45 days, then.

17         Next, you agree that November 1st can be the date in

18   which interrogatories can be served.  Then I gather the last

19   date to serve requests for production, the reason, Mr. Posner,

20   you say NA is because you had hoped that the September 30th

21   date would be the be all and end all here, but I'm not agreeing

22   to that.  So in light of that, what is your view of how to

23   handle that subject at this time?

24         MR. POSNER:  I guess we didn't see a need for that.

25   We didn't view a date as necessary, we don't typically have

L5DGUNIC

1    that.

2           THE COURT:  Well, sure you do.  In cases parties want

3    to make sure there's a deadline for production in advance of

4    depositions, right.  So if it's November 29th, according to the

5    relator, that would mean, under the rules, 30 days would be end

6    of December, ruining people's holidays, to have production in

7    hand so that you would have all your documents for the

8    depositions in January and February.  That's what that date

9    means, to me, if that's really what you all want, at least on

10   the relator's side.  I don't like ruining people's holidays

11   myself, I don't like that schedule at all particularly.

12          MR. OPPENHEIMER:  Your Honor, if Mr. Posner's position

13   is that we don't need a date for service of RFPs at the end,

14   we're fine not specifying a date for that as well.  The purpose

15   here was, as you suggested, to make sure that documents were

16   received in time.  But that can be accomplished just by issuing

17   the RFPs at the right time.  So we are fine with agreeing to

18   not have a date for this item.

19          THE COURT:  All right.  We won't put a date there,

20   then.

21          The last date to serve interrogatories and RFAs, now I

22   think if I'm understanding the disagreement that's reflected

23   here, the reason the defendant proposed January 28th is that's

24   30 days in advance of the end of the proposed phase one fact

25   discovery deadline.  And so therefore, if RFAs were to be

L5DGUNIC

1    served, for example, on January 28th, the deadline to respond

2    would be February 28th; whereas if they were served on

3    February 12th, the deadline would exist past the end date of

4    fact discovery.  And as you may well know, there's been case

5    law over the years debating whether RFA requests served after

6    the 30 days in advance of a deadline are ones that someone has

7    to respond to.  So this would make it clear, if it were

8    January 28th, that it would be concluded within the parameters

9    of the fact discovery end date that you all have agreed to.

10   But the relator, I think, is trying to protect the fact that

11   there could be RFAs in phase two.  Am I getting the gist of

12   this correctly or am I missing something?

13           MR. POSNER:  As for us, you are correct, your Honor.

14           THE COURT:  That's Mr. Posner.  You need to identify

15   yourself for the court reporter.

16           MR. POSNER:  You're right.  I apologize.  This is

17   Mr. Posner.

18           That was our thinking, before the end of fact

19   discovery, this would apply to phase one.  So if the question

20   is, well, do we get more in phase two, that would be decided

21   later.  So yes, that was our thinking, your Honor.

22           THE COURT:  Mr. Oppenheimer, why wouldn't January 28th

23   make sense for the RFAs or any other last-minute

24   interrogatories being served so that the responses were due

25   within the deadline of the phase one fact discovery schedule?

L5DGUNIC

1          MR. OPPENHEIMER:  Your Honor, I think you hit the nail

2     right on the head.  As long as we're clear that this is only

3     for phase one, then we're fine with January 28th.  The dispute

4     was, I think, about whether it was tied specifically to phase

5     one.

6          THE COURT:  Well, this is for phase one, and

7     everything is related to phase one.  That's what we're dealing

8     with right now.  So it will be January 28th, then, for that

9     category.

10         And I think we have now heard that there's agreement

11    about 13 fact witnesses for each side, up to 13 for each side

12    for phase one.  Phase two will be whatever that will be, but

13    this is for phase one.

14         Similarly, I guess, to be clear, with respect to

15    interrogatories, it's 25 inclusive of subparts, without

16    prejudice to interrogatories in another phase, because we're

17    not dealing with another phase.

18         Anybody want to be heard on either of those subjects?

19    It seems to me there's essentially agreement.

20         MR. OPPENHEIMER:  I think we're in agreement on that.

21         THE COURT:  Mr. Posner?

22         MR. POSNER:  That's fine, your Honor.

23         THE COURT:  And then you agree that within 21 days of

24    the Court's decision on the motion to dismiss, you'll meet and

25    confer to discuss whether the decision impacts essentially the

L5DGUNIC

1    schedule that's in place, and that's fine.

2              Is there anything else with respect to the schedule

3    that we need to discuss?

4              MR. OPPENHEIMER:  Not from the relator, your Honor.

5              THE COURT:  Mr. Posner?

6              MR. POSNER:  Not from us, your Honor.

7              THE COURT:  Let's move on to the exciting topic raised

8    belatedly in the correspondence of this week; the May 10th

9    letter from McKesson and the May 12th response received almost

10   at 6:00 o'clock last night from the relator.

11             Let me start by saying, this is not how we're going to

12   proceed going forward.  I cannot be expected to drop everything

13   and just focus on last-minute disputes that are brought to my

14   attention.  So for the future, the next conference we'll

15   schedule, we're going to put specific dates by which you have

16   to send any letters and any responses.  And it can't be less

17   than 24 hours before the conference, because that's not fair to

18   the Court with all due respect.

19             So if I get the gist of this -- and tell me if this is

20   wrong -- as I understand the history here, the Department of

21   Justice served a CID on McKesson.  McKesson produced documents

22   to the Department of Justice.  The Department of Justice shared

23   those documents with the relator with limitations.  The relator

24   then sought to have the CID documents reproduced as part of

25   discovery here, and I said no.  And then the relator got

L5DGUNIC

permission from the Department of Justice to produce the CID

documents back to McKesson in response to McKesson's discovery

requests.  And McKesson now doesn't want the CID documents to

be in the case and, therefore, wants me to order them to

somehow -- I don't know what the right phrase is -- take them

back, withdraw them.  I'm not sure I know exactly what that

means or that the federal rules contemplate that exactly.

          But am I right so far in my summary of what has

transpired to date, Mr. Posner?

          MR. POSNER:  The answer to that question is no.  So

let's start from the top.  So as your Honor knows, there's a

federal statute that limits the ability of the United States.

It allows them to share documents with the relator in a False

Claims Act case only as part of an investigation, which of

course ended a while ago.  Now, the United States and the

relator executed an agreement, which we don't have because they

haven't produced it yet.  The agreement imposed limitations on

the relator's ability to produce the documents.  What the

relator has said about the agreement -- which we don't have --

is that they can only -- the agreement, I'm almost certain,

prohibits the relator from using the documents in this case.

I'd like to see the agreement to confirm that, but that's what

I'm pretty sure it says.  The relator has told the Court

previously, in the February joint filing, that we can only use

these documents if McKesson produces them or if McKesson agrees

L5DGUNIC

1      that they'll be deemed produced, which of course we've done

2      neither of those things.  The relator, as your Honor remembers,

3      tried to get the Court to order these documents to be produced,

4      the Court refused to do that.  The parties then exchanged

5      requests for production.

6              Now, apparently, relator called up Assistant United

7      States Attorney JD Barnea.  I don't know what was said.  I've

8      spoken with Mr. Barnea -- it would be good to get him on the

9      phone -- my understanding is the relator said to Mr. Barnea --

10     and again, it would be better to hear from the government on

11     this -- but the United States has not abrogated and edited

12     their written agreement with the relator based on some phone

13     call between the relator and AUSA Barnea., I believe that would

14     be the position of the United States here.  They called up AUSA

15     Barnea and they said, hey, we've got these document requests,

16     and they read them snippets of the request, so we think we need

17     to be able to produce them, you're not going to stop us, are

18     you?  And AUSA Barnea said -- this is what he told me, it would

19     be better to hear from him directly -- but what Mr. Barnea said

20     was, look, it seems kind of silly that McKesson is going to

21     reproduce them to you, they didn't want them produced, but I'm

22     not going to get in your way and take a position, I'm not going

23     to stop you.  If you say you think the document requests compel

24     you to produce them back to to McKesson, I'm not going to say

25     no.  That's what Mr. Barnea said to me.  So I dispute that the

L5DGUNIC

United States has edited their written agreement orally based

on some conversation that the relator had with Mr. Barnea to

suddenly allow the documents to be used in this case.  And

there's a statute that says you can't do that and an agreement,

which is in writing, which we haven't seen, that prohibits them

from doing that.  So I can't imagine that the government has

now edited their agreement based on some oral conversation and

allowed the documents to be used in this case.

          The United States takes the position, as they

consistently have, that they can share the documents with the

relator just as part of the investigation.  They're not

supposed to be used in a qui tam case.  They're sensitive law

enforcement documents.  Now, the other reason of course they

shouldn't be used in this case is because they don't relate to

phase one.  The vast majority of them don't relate to phase one

at all.  But the long answer to your question, your Honor, no.

We do not believe the United States has consented to this.

Now, they should probably speak for themselves on this, but we

dispute that they have agreed to that.

          THE COURT:  Well, the relator's letter to the Court

says, "DOJ granted relator permission to produce the CID

documents in response."  I'm quoting now.  You're saying that's

untrue?

          MR. POSNER:  Does it sound credible to you that the

United States would edit their agreement that we haven't seen

L5DGUNIC

1    based on some oral conversation?

2            THE COURT:  Well, I don't know about editing an

3    agreement.  But editing an agreement and granting permission

4    don't have to be the same thing, do they?

5            MR. POSNER:  Well, they do if the agreement prohibits

6    them from using them.  Yes, we dispute that.  This is a big

7    issue for the government.  The government doesn't want these

8    documents used in these cases.  It defies belief, based on the

9    history of what's gone on in this case, that the government

10   would just, in a phone call, yeah, the judge said you couldn't,

11   yeah, our agreement says you can't, yeah, the statute says

12   this, but you know what, go ahead.

13           THE COURT:  Can I ask a broader question, Mr. Posner?

14   Why does this matter at this juncture one way or the other?

15   How are these documents even being, quote, used?  All that's

16   happened is they responded to a document request that you

17   served by producing some of your own documents to you.  They're

18   not part of any court filing.  They haven't yet been used in

19   depositions.  They're not part of motion practice.  They

20   wouldn't otherwise be in front of the court or involve the

21   court in any way.  So I'm not sure I understand, at least at

22   this moment in time, why this matters one way or the other.

23   Can you tell me why?

24           MR. POSNER:  Fair question.  It only matters in the

25   following way -- I mean, you are right, your Honor, that some

L5DGUNIC

1    sort of phantom reproduction to us is sort of irrelevant so far

2    as it goes -- all we want is what your Honor ruled before,

3    which is, for now, the documents can't be used in phase one.

4    We don't have to like give it back to them.  To some extent,

5    that's a fiction.  What we want is the basics of their

6    agreement with the government, you can't use them in this case,

7    at least for now, which your Honor ruled.  That's what we want.

8    We don't have to give it back to them.  We're not going to

9    stand on ceremony or fiction.  But we want the practical impact

10   here to be what the statute says and what we believe their

11   agreement with the government says, which again would be good

12   to see, which is, you can't use them, at least in phase one.

13        THE COURT:  Well, to be clear, my ruling in March was

14   that you did not have to make any production of this collection

15   of documents.  I don't think I ever ruled that these documents

16   can't, quote, be used in phase one, whatever that may mean.

17   Where did I say that?

18        MR. POSNER:  Well, your Honor, I hope none of this is

19   going to be sort of really tricky about this.  What we're

20   asking for -- whether you ruled that or not, the way we took

21   your Honor's ruling was to be the phase one documents are --

22   the DOJ production, the vast majority of them don't relate to

23   phase one, so what I took your Honor -- maybe you didn't mean

24   this -- what I took your Honor's ruling to mean was those

25   documents are out for now, and we shouldn't deploy some

L5DGUNIC

1    artificial kind of reproduction to get around that.  And we

2    should respect the agreement that the relator has with the

3    government.  My recommendation is -- unfortunately, I was

4    trying to keep AUSA Barnea out of this -- but I do think we

5    need to hear from the government on this question.

6         THE COURT:  We may well need to from the government on

7    this question.  I don't know that we need to hear from the

8    government on this question now, because I don't see how any of

9    these documents are being, quote, used yet in phase one

10   discovery.  If you tell me that they're going to use these

11   documents in depositions and you object to that, that's

12   probably many months away from now.  And I'm not sure the

13   relator has any sense yet about whether they're going to have

14   to use these documents that are in the CID collection, because

15   some of the documents, I'm guessing, in the CID collection may

16   end up being produced as part of normal discovery, if I can

17   call it that, in this case.  So I think it's premature to

18   assess that question.  Isn't it?

19        MR. POSNER:  Your Honor, as long as you're not deeming

20   it as in the case right now, I'm fine with deferring until the

21   issue is more ripe.  Our view is you can't use them.  You can't

22   use them to amend your complaint.  Their letter to you uses the

23   documents repeatedly, right, on the substance.  Well, it shows

24   this fact and this fact and this fact.  So to that extent, yes,

25   they're already using them.  If your Honor wants to rule, look,

L5DGUNIC

1    it's premature.  If you want to say, I'm not ruling that

2    they're in this case yet, if they really try to use them in

3    some substantive way, we'll hear it then, I suppose that's

4    fine.  Although recognizing they've already tried to use them

5    in their letter to you.  But I'm trying not to stand on

6    ceremony.  My view is the basics, like you can't use them in

7    this case.  And I'm willing to defer until the first practical

8    use of them in this case, whether to amend a complaint or use

9    it at a deposition or some filing or what have you.  Although

10   they have used it in the filing already.

11           THE COURT:  Is it not possible, as I suggested, that

12   some documents in the CID collection will be produced by

13   McKesson to the relator in discovery?

14           MR. POSNER:  Yes, to the extent they relate to phase

15   one, they may very well be.  And we would produce those.

16           THE COURT:  Let me hear from Mr. Oppenheimer about all

17   of this.  You have made a lot of comments and actually cast

18   some aspersions, so Mr. Oppenheimer needs to be given an

19   opportunity to defend himself and his client.

20           Mr. Oppenheimer?

21           MR. OPPENHEIMER:  Thank you, your Honor.  And if I can

22   start on that point there, a lot of what Mr. Posner just said

23   is, I'll just say first, incorrect, but based on an agreement

24   he hasn't seen, conversations that he wasn't part of.  So I'll

25   start by clarifying.  We have written consent from the DOJ to

L5DGUNIC

1    produce these documents.  This is not some fly-by-night phone

2    call, as Mr. Posner characterized it.  They consented in

3    writing for us to produce the documents.

4         I'll also say, it's odd that McKesson is trying to

5    assert an agreement between DOJ and relator about how the

6    documents would be used to its own benefit.  It's not a

7    third-party beneficiary of any sort of agreement here.  If

8    there's an issue with how we're using the documents -- and to

9    be clear, there isn't, we've gotten permission to produce them

10   in the case, and we have produced them accordingly -- if there

11   were some issue, the United States government through the

12   Department of Justice can take that up.  But that's not

13   McKesson's argument to make.  And it doesn't shield McKesson

14   from having the documents produced back in response to their

15   own requests.

16        On that point, I think it's quite clear that

17   McKesson's requests asked for these documents, and so we have

18   produced the documents to them.  And we have done that with

19   permission.

20        McKesson cited the statutory provision a couple of

21   times, but just to be clear, the statute that they're citing,

22   31 U.S.C. §3733, that is an affirmative grant of permission for

23   the DOJ to share documents.  It doesn't cabin DOJ's ability.

24   It just gives them the ability to share it under certain

25   circumstances when they so choose.  DOJ shared the documents

L5DGUNIC

1   with relator here.  Relator has a copy of the documents --

2   relator's counsel, I should say, has a copy of the documents.

3   And so they were documents that we had when McKesson asked us

4   to produce the documents we received from the government.  The

5   government authorized us to produce them, and we produced them.

6   I think it's directly within the heartland of the request that

7   McKesson made.  I think also Rule 26 independently would have

8   required us to produce them, once the government cleared us to

9   do so.  So I think the documents have been correctly produced.

10       And I think all of McKesson's arguments about whether

11   they can be used in certain ways and whether there's a dispute

12   on that, I don't think McKesson really has any standing to

13   argue that in the first place.  I think if the Department of

14   Justice believes that we are not using the documents correctly

15   according to our agreements, the Department of Justice can say

16   so.

17       THE COURT:  Is there any reason that the relator can't

18   produce to McKesson both the initial agreement with the

19   Department of Justice and the written consent you have recently

20   received to utilize the CID documents?

21       MR. OPPENHEIMER:  Your Honor, I believe that, at least

22   in large part, many of our communications with the government

23   are likely to be covered by the common interest privilege.  I

24   would have to look at those particular documents to see if they

25   have any substance that would bring them into that privilege.

L5DGUNIC

1    Assuming that they are not within the scope of the common

2    interest privilege, I don't think that would be an issue.  I

3    would need to look at the relevant documents again before I can

4    commit that there's no privilege concerns.

5         THE COURT:  Because I assume if a request has not

6    already been made, it will be made for the production of those

7    agreements and/or consents, however characterized.  So that

8    issue probably needs to be teed up sooner rather than later as

9    it relates to what we're talking about at this juncture.

10        I think it's safe to say, Mr. Oppenheimer, certainly,

11   McKesson did not intend in its request for documents to solicit

12   from you the very documents it's trying its hardest to keep out

13   of the case.  Having said that, it doesn't mean you couldn't

14   have read it the way you did, and it certainly doesn't mean

15   that independent of how one might read them, that you could

16   decide that you had certain obligations under Rule 26 to

17   produce some or all of these documents because, I dare say, I

18   suspect at least some subset of this CID collection is relevant

19   to what we've characterized as phase one discovery.

20        So I think that McKesson has literally asked the Court

21   to direct the relator to, quote, "withdraw the production."

22   I'm not going to do that.  So that request is denied.

23        And with respect to its request that the Court direct

24   that the relator, quote, "cease use" of the CID documents that

25   were produced in the litigation, I'm going to defer any ruling

L5DGUNIC

on that, because I don't think any use has been material for

purposes of advancement of the lawsuit per se.  Yes, it's true

that some documents in the collection were submitted to the

Court as part of this application, but that's understandable

for purposes of trying to help the Court understand the nature

of the application.

I think, however, that this is certainly not the end

of this issue or this discussion.  And that's why I suggest

that the relator figure out what it can provide to the

defendants with respect to what had been agreed to with the

department consistent with the provisions of the False Claims

Act, what modifications may have been made consistent with this

written consent you have received, and what can be provided to

McKesson in that regard so they understand and the playing

field is leveled, if you will, to the extent possible on this

point.  But at least on the record presented to me, it strikes

me as premature, if not way premature, to make some ruling

about the use of these CID documents.  In part, as I say, also,

because I suspect there may be some overlap or duplication in

production along the way, which would render this an academic

discussion, rather than a practical one.  So I'm not going to

grant the request that McKesson asked for in its May 10th

letter.

I assume, Mr. Posner, you are amenable to my sealing

the letter that was submitted in redacted form by relator's

L5DGUNIC

1    counsel yesterday; correct?

2              MR. POSNER:  Yes, your Honor.  Thank you.

3              THE COURT:  So I will do that.

4         And I think they proposed that you respond within 14

5    days.  I don't think that's necessary, given the nature of

6    things here.  I'll simply order that it be sealed until further

7    order of the Court, whenever it may be appropriate to

8    reconsider that.

9         Other than scheduling our next conference and any

10   submissions related thereto, are there any other issues we need

11   to address today?

12             Mr. Oppenheimer?

13             MR. OPPENHEIMER:  Not from the relator, your Honor.

14             THE COURT:  Mr. Posner, any other issues for today?

15             MR. POSNER:  No, your Honor.  Thank you for the time.

16             THE COURT:  So I was going to propose we have our next

17   conference June 17th, which is a Thursday, I believe.  Would

18   that work for you?

19             MR. OPPENHEIMER:  Your Honor, we have a conflict on

20   the 17th, but we could do the 16th, if that's available.

21             THE COURT: Let me just check my calendar.  Hold on.

22        That should be fine.  Why don't we say, let's do it at

23   3:00 o'clock on the 16th.

24        And if I could then ask for any letters in which you

25   want to identify subjects for the agenda where there are

L5DGUNIC

1    disputes, where you need the Court to make any resolution, that

2    they be submitted by the 9th of June, and that any response be

3    submitted no later than 5:00 o'clock on Monday the 14th.

4            MR. OPPENHEIMER:  That works for the relator's side,

5    your Honor.  Thank you very much.

6            THE COURT:  That will work for you, Mr. Posner?

7            MR. POSNER:  Yes.  Thank you very much.

8            THE COURT:  Was someone trying to speak?

9            MS. MOLLER:  I'm sorry, I wasn't sure if Mr. Posner

10   was available.  But that date is fine with us.

11           THE COURT:  So that's what we'll do next.  So same

12   dial in number as we've been using.  Thank you all very much.

13   Have a good afternoon.  Be well everybody.

14           (Adjourned)

15

16

17

18

19

20

21

22

23

24

25